**Johnny Lee REY, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 71,459.

Court of Criminal Appeals of Texas, En Banc.

March 15, 1995.

Rehearing Denied May 3, 1995.

C.R. Daffern, Amarillo, for appellant.

Jim Vollers, Sp. Prosecutor, Austin, Robert Huttash, State's Atty., Austin, for the State.

*OPINION*

MALONEY, Judge.

Appellant was convicted of capital murder committed in the course of burglary. Tex.Penal Code Ann. § 19.03(a)(2). The jury affirmatively answered the two special issues submitted to it and appellant was sentenced to death. Tex.Code Crim.Proc.Ann. art. 37.071 § 2(b), (e). Appeal to this Court is automatic. Tex.Code Crim.Proc.Ann. art. 37.071(h).

■ In his first point of error appellant claims the trial court erred in denying his motion for the appointment of an independent forensic pathologist to assist him in the preparation and presentation of his defense. We will reverse.[1]

### I. Preservation of Error

■ The State contends that no error was preserved for review because appellant failed to obtain a ruling on his motion.

Appellant's motion was presented at the end of the first day of testimony during the guilt phase of trial. After hearing arguments from the parties, the trial court stated that he would not rule on the issue until hearing the direct testimony of the State's pathologist, Dr. Ralph Erdmann. The parties argued further about whether appellant could select his own expert. The trial court stated that it would permit the appointment of the expert selected by appellant if it ruled favorably on appellant's motion, but reiterated that it was reserving the right to rule on the motion later.

The next day Erdmann testified on a bill of exceptions as to his qualifications as an expert.[2] Immediately thereafter appellant asked the court whether it had made a determination on his motion for the appointment of a pathologist. The court responded that it had extensively researched the issue and would give a ruling after a short recess; however, no further proceedings appear in

---

**1.** In his fifth point of error appellant claims the evidence is insufficient to sustain an affirmative finding to the second punishment issue, whether there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. We have reviewed the record of both the guilt and punishment stages of trial. Despite appellant's youth and the lack of an adult criminal record, based upon appellant's extensive juvenile record and the psychological testimony, we conclude the evidence is sufficient to sustain an affirmative finding to the second issue. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Point of error five is overruled. Given our disposition of point of error one we need not address the remainder of appellant's points of error.

**2.** Before Erdmann was to testify before the jury, the State presented a Motion in Limine seeking to bar appellant from impeaching Erdmann with specific acts of misconduct related to autopsy reports that he had prepared in other cases. The court ruled that appellant could question Erdmann about misconduct in other cases only if relevant to his qualifications as an expert. Appellant thereupon requested an opportunity to perfect a bill of exceptions, which was granted.

the record for that day. The next day during Erdmann's direct testimony before the jury, appellant objected to the State's introduction of autopsy photographs. During his objection appellant stated "I would remind the Court that the Court previously denied my request for my own pathologist." No one objected to this statement. Although some of appellant's objections to the photos were unclear, he objected in part because he did not have his own pathologist to assist in cross-examining Erdmann regarding them.[3] That objection was overruled.

█ The State does not contend that appellant's objection and motion were not sufficient to apprise the court or the State of his complaint; rather, the State says error was not preserved because the trial court's ruling on the motion does not appear in the record. While we require that a defendant's objections be specific enough to effectively communicate his complaint to the court, we are less stringent in our requirements of the trial court's ruling on an objection. A court's ruling on a complaint or objection can be impliedly rather than expressly made. *See, e.g., Chappell v. State*, 850 S.W.2d 508, 510 (Tex.Crim.App.1993) (defendant's objection to jury shuffle overruled when trial judge granted State's motion to shuffle); *Ramirez v. State*, 815 S.W.2d 636, 650 (Tex.Crim.App.

1991) (trial judge "implicitly overruled" defendant's objection to State's question by directing witness to answer question); *Beebe v. State*, 811 S.W.2d 604, 605 (Tex.Crim.App. 1991) (where defendant requested additional time and trial court stated he would attempt to dispose of all pending cases if "humanly possible" in the morning, trial court's response was sufficient to preserve error). A trial court's ruling on a matter need not be expressly stated if its actions or other statements otherwise unquestionably indicate a ruling. *Cf. Moody v. State*, 827 S.W.2d 875 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 119, 121 L.Ed.2d 75 (1993). In *Moody*, the defendant complained the trial court abused its discretion by its sua sponte excusal of a veniremember. Although "the statement of facts [did] not include a transcription of the discussions between the trial court and this veniremember nor delineate the precise moment in time when the excusal was made," we concluded that comments by the trial court and testimony of the deputy clerk indicated the reasons for the excusal and proved that it was made after the panel was sworn but before individual questioning. *Id.* at 879.

Appellant twice requested the court to make a ruling and then stated for the record that the court had denied his motion. Nei-

---

3. Appellant initially objected as follows:

> *I would remind the Court that the Court has previously denied my request for my own pathologist* that I—these photographs will be introduced, they will be highly prejudicial to the Defendant in this case. That also I have previously objected to Dr. Erdmann testifying. I don't know how—according to the Court's Motion in Limine, how I can impeach him on some of this, Judge.
>
> And if these photographs are let into evidence, the only purpose and the net result would be totally prejudicial to my client and *I will be unable to impeach on autopsy photographs without my own expert pathologist.*
>
> And I would also point out to the Court that Dr. Sparks Veasey is a State's witness and has been subpoenaed by the State. And although I intend to call him at some point in time if the State does not, but I just—I feel those things are so prejudicial that they just would outweigh anything.
>
> *The doctor's testimony will be very difficult for the Defense to try to rebut or offset, Judge.* And I feel like those photographs will make it impossible.

(emphasis added). The court attempted to clarify appellant's objection before ruling. Appellant stated that he was objecting to the repetitive and prejudicial nature of the photos and also

> ... that *I'm not going to be able to cross-examine the doctor on these photographs as to the blows.*
>
> *Were I to have a pathologist, then I can understand the introduction of those....*

(emphasis added). The court then stated that it overruled appellant's objection under Rule of Criminal Evidence 403 and as to repetitiveness, but that it did not understand the other objection. Appellant then stated

> Judge, what I'm saying is these other photographs are going to be introduced, the net effect of those will be—and *I could see if the photographs being introduced were the issue placed in evidence between two pathologists as to the injuries....* The accumulation of all these photographs are going to be such that the only purpose is going to be to prejudice the jury.

(emphasis added). The court overruled the objection.

ther the court nor the State corrected that statement. In addition, appellant renewed his motion in objecting to the introduction of Erdmann's autopsy photographs, and the court expressly overruled that objection. We hold the record sufficiently reflects that the trial court ruled adversely to appellant's motion and thus the issue was preserved for review.

## II. The Merits of Appellant's Motion

In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the defendant requested the appointment of a psychiatrist to assist on the issue of his sanity at the time of the offense. The Supreme Court explained that due process requires access to the raw materials integral to the building of an effective defense. *Id.* at 77, 105 S.Ct. at 1093. While the State need not "purchase for an indigent defendant all the assistance that his wealthier counterparts might buy," it must provide him the basic tools to present his defense within our adversarial system. *Id.* The Court set forth the following three factors as relevant considerations in determining "whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance":

> The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

*Id.*

The Supreme Court devoted only a paragraph to each of the first two factors. They stated that an individual's interest in the accuracy of a proceeding where his life or liberty is at stake is "obvious and weighs heavily" in the analysis. *Ake*, 470 U.S. at 78, 105 S.Ct. at 1093. Given that the State also maintains an interest in the legitimacy of the verdict, the only interest the Supreme Court could identify that weighs against an accused's interest in an accurate outcome is the State's concern for judicial economy. In *Ake*, the Court concluded that the State's interest in judicial economy was "not substantial, in light of the compelling interest of both the State and the individual in accurate dispositions." *Id.* at 79, 105 S.Ct. at 1094.

The Court placed the greatest emphasis on the third factor, discussing the importance of psychiatric testimony in conveying to the factfinder an understanding of the defendant's mental state and its potential impact on his behavior at the time in question. The Court concluded that the risk of an inaccurate verdict was high where the defendant was not assisted by a psychiatrist to "help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses." *Id.* at 82, 105 S.Ct. at 1096. The Court further stated that where it is clear that the defendant's sanity is likely to be a significant factor, "a defense may be devastated by the absence of a psychiatric examination and testimony; with such assistance, the defendant might have a reasonable chance of success." Therefore, the Court held that

> ... when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id.* at 83, 105 S.Ct. at 1096.

### A. *Ake* Applies to Non-psychiatric Experts

Appellant contends that he was entitled under *Ake* to the assistance of his own pathologist. The State argues that the opinion of a pathologist is not comparable to the opinion of a psychiatrist so as to fall within the parameters of *Ake*. Appellant argues that the type of expert is immaterial and that the important question is whether the trial was fundamentally unfair without the assistance of the requested expert.

■ Most courts that have considered the application of *Ake* have held that where an indigent defendant established a substantial need for an expert, without which the fundamental fairness of his trial will be called into question, *Ake* requires the appointment of an expert regardless of his field of expertise.[4] As explained by the Eighth Circuit:

There is no principled way to distinguish between psychiatric and nonpsychiatric experts. The question in each case must be not what field of expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given.

*Little v. Armontrout,* 835 F.2d 1240, 1243 (8th Cir.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). *Ake* is not limited to psychiatric experts; but the type of expert requested is relevant to the determination of whether the trial was fundamentally unfair without the expert's assistance. The nature of an expert's field and the importance and complexity of the issue will bear directly upon whether the appointment of an expert will be helpful. For in-

stance, in reaching its conclusion in *Ake* the Supreme Court recognized that psychiatry is not an "exact" science, that experts within the field often disagree on important issues and that the issue of a defendant's sanity was to jurors "complex and foreign." *Ake,* 470 U.S. at 81, 105 S.Ct. at 1095.

■ The State argues that because a pathologist's opinion is based upon "concrete observations" as compared to the opinion of a psychiatrist which is based upon more uncertain variables, *Ake* does not apply. Certainly human behavior involves variables that are more uncertain and elusive than the physical variables upon which a pathologist draws conclusions in conducting an autopsy. Nevertheless pathology, like psychiatry, is a subspecialty of the science of medicine. Medicine in any of its sub-specialties eludes mathematic precision, as evidenced by the need for a "second opinion" with regard to any important medical question. Causation or mechanism of death are examples of important medical questions addressed by pathologists that require more than an objective or rote determination.[5] We accordingly

---

4. *E.g., Terry v. Rees,* 985 F.2d 283, 284–85 (6th Cir.1993) (holding defendant deprived under *Ake* of opportunity to present effective defense by denial of independent pathologist to challenge government's position as to cause of death); *Little v. Armontrout,* 835 F.2d 1240, 1244 (8th Cir. 1987) (holding defendant entitled under *Ake* to expert on hypnosis), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988); *Dubose v. State,* No. CR–89–359 slip op., 1993 WL 381482 (Ala.Crim.App., Sept. 30, 1993) (defendant entitled to appointment of DNA expert); *State v. Coker,* 412 N.W.2d 589, 593 (Iowa 1987) (*Ake* entitled defendant to appointment of expert of intoxication defense); *Harrison v. State* 635 So.2d 894, 900–902 (Miss.1994) (*Ake* entitled defendant to appointment of forensic pathologist); *State v. Ballard,* 33 N.C. 515, 428 S.E.2d 178, 180 (recognizing that it has applied *Ake* to "defendants' motions for many kinds of experts, including independent investigators"), *cert. denied,* —— U.S. ——, 114 S.Ct. 487, 126 L.Ed.2d 438 (1993).

Numerous courts appear to assume that *Ake* applies to other types of experts by entertaining defendants' *Ake* claims with respect to the appointment of a variety of types of experts, but rejecting those claims for other reasons. *See, e.g., Yohey v. Collins,* 985 F.2d 222, 227 (5th Cir.1993) (rejecting defendant's request for appointment of ballistics and forensic experts because he failed to establish reasonable probability that experts would have been of assistance);

*Moore v. Kemp,* 809 F.2d 702, 711–12 (11th Cir.) (assuming "for sake of argument" that *Ake* applies to nonpsychiatric experts, and addressing defendant's claim as to appointment of expert to examine physical evidence), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987); *Tatum v. State,* 259 Ga. 284, 380 S.E.2d 253, 254–55 (1989) (defendant not entitled to expert to support his theory that gun "hangfired" where he failed to show that such expert was critical or reasonably necessary to his defense); *State v. Gordius,* 544 A.2d 309, 311 (Me.1988) (rejecting defendant's request for psychologist to testify to accuracy of child's recollection because defendant did not demonstrate such opinion was beyond common knowledge and had sufficient reliability as to be admissible); *Plantz v. State,* 876 P.2d 268, 274 (Okla.Crim.App.1994) (defendant not entitled to investigator where he failed to make sufficient showing of need); *State v. Jaques,* 428 N.W.2d 260, 263–64 (S.D.1988) (trial court did not abuse discretion in denying request for appointment of experts to analyze physical evidence where such assistance was necessary for adequate defense); *State v. Edwards,* 868 S.W.2d 682, 697–98 (Tenn.Crim.App.1993) (defendant who failed to meet minimum threshold showing of particular need not entitled to appointment of DNA expert).

5. We have previously discussed whether autopsy reports are subjective or objective in nature:

reject the State's contention that the appointment of a pathologist does not fall within the parameter of *Ake*. We hold only that the appointment of a pathologist is not per se excluded from the confines of *Ake*—in any given case, the necessity for the appointment under *Ake* will depend upon whether the defendant has made a sufficient threshold showing of need for the expertise of a pathologist in that particular case.

### B. Appellant's and the State's Interests

■ As discussed above, the accused's and the State's interests must be factored into the analysis in each case, in addition to the defendant's threshold showing which is the weightiest consideration. In this case, we view the positions of the respective parties much as the interests of the parties in *Ake*. Appellant, charged with capital murder, has an interest in the accuracy of the proceedings that "is obvious and weighs heavily" in the analysis. *Ake*, supra. The State likewise maintains an interest in the accuracy of the result. Appellant seeks a pathologist to assist in his defense. Pathologists are readily available in all metropolitan areas and most communities of any size, although there might not have been a pathologist readily available in Randall County where appellant's trial took place. At any rate, the trial court in this case had already approved the use of a particular pathologist from Dallas were he to rule favorably on appellant's motion. We cannot conclude that the cost of bringing such expert to Randall County, within a day's drive of Dallas, would be unmanageable. Appellant's counsel testified that the expert charged $250 an hour, that

the expert projected this to be a "one-day case" and that she expected her total fee would be approximately "$2,000 plus expenses." Given the weight of appellant's interest in an accurate result, we conclude that the State's interest in judicial economy is "not substantial" in this case. Accordingly, like in *Ake*, appellant's interest weighs more heavily than the State's.

### C. Appellant's Threshold Showing

■ Addressing the third consideration in the analysis, *Ake* held that a defendant must make a preliminary showing that his sanity was "likely to be a significant factor" at trial. *Ake*, 470 U.S. at 74, 82–83, 86, 105 S.Ct. at 1091–92, 1095–96, 1097–98. In *Caldwell v. Mississippi*, 472 U.S. 320, 323–24 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985), the Supreme Court declined to entertain a petitioner's *Ake* claim where he "offered little more than undeveloped assertions that the requested assistance would be beneficial." A brief discussion of the facts is helpful for purposes of determining whether appellant made a sufficient threshold showing.

Sometime after midnight on May 12, 1990, appellant and five of his companions decided to burglarize a house. According to appellant's confessions, they intended to burglarize a house that was unoccupied, but "hit the wrong house." After kicking in the door to the deceased's trailer house appellant and his cohorts saw the deceased in his bedroom with a flashlight. A struggle ensued and the offenders beat and kicked the deceased. They took a few items and fled the scene, leaving the deceased lying on the floor. Ap-

---

Much of what a medical examiner observes and reports will be objective, routine, scientific determinations of an unambiguous nature. From these determinations, the medical examiner may draw conclusions which, to varying degrees, will be subjective. Therefore, reports prepared by a medical examiner may be both objective and subjective.

*Garcia v. State*, 868 S.W.2d 337, 341 (Tex.Crim. App.1993). Agreeing with the majority that the medical examiner's conclusions are largely subjective, Judge Maloney in dissent further observed that a determination as to cause of death ... is comparable to diagnosis of illness, sometimes simple, but quite often subject to further question. In both cases, analysis is based upon certain known physical facts. Because

medical diagnosis is subjectively fact bound, people often seek a second or even third medical opinion upon receiving an unfavorable diagnosis. In the case of an autopsy, the medical examiner is not confined in his analyses to observable outward symptoms; he is able to examine and test vital organs. Nevertheless, the medical examiner's determination of causation is based upon a synthesis of his medical training and education, his experience in the field, his examination of the body and its parts.... His conclusions derive from an analytical thought process involving certain judgment calls which may be subject to interpretation and human error.

*Garcia*, 868 S.W.2d at 343–44 (Maloney, J., dissenting).

pellant stated in his written confession that the deceased was alive when they left the scene, but "wasn't breathing right, kind of funny but I thought he would be alright."

The deceased's autopsy was conducted by Dr. Erdmann who concluded that the mechanism of death was "acute cerebral edema with subsequent severely increased intra-cranial pressure, compression of the vital medullary centers, and ending in cardio-respiratory arrest." The autopsy further concluded that the deceased "had had previous open heart surgery but it did not result in complications that might have aggravated or be in a way directly or indirectly responsible for the final factual outcome of this case." One of appellant's codefendants had retained Dr. Leroy Riddick, the Director of the State Medical Examiner's Office of Alabama, who reviewed Erdmann's findings and reported that he had serious questions about Erdmann's conclusions. Appellant's motion was based largely upon Riddick's affidavit.

█ Appellant claimed that the mechanism of death [6] would be a "significant factor" at trial so as to entitle him to the assistance of a pathologist. In his written motion and in his oral presentation before the trial court appellant argued that he needed his own forensic pathologist to evaluate, pursue, and present a defense based upon the theory that the deceased died from a heart attack, not from blows to the head. Appellant explained that the blows incurred by the deceased were not consistent with an intentional killing or with deliberateness, reasoning that since such blows would not usually cause the death of an adult male, death was not a result that was foreseeable. Evidence that the deceased did not die as a result of the blows, but rather due to a heart attack would support appellant's defense that he did not intend to kill the deceased by beating him and that he did not act deliberately with the reasonable expectation that death would result.[7]

In support of his motion, appellant presented an affidavit from Riddick which stated that he "strongly disagre[ed]" with Erdmann's conclusion that the deceased had died solely from the blunt force injuries, as those injuries were "much too superficial to cause the death of a healthy man of [the deceased's] age." He further stated that "[i]n all likelihood, [the deceased] would have survived those injuries, but for the fact that he had a badly diseased heart." Riddick stated that he was "quite disturbed" by Erdmann's failure to investigate the deceased's heart condition as an alternative cause of death and noted that there was nothing contained in the autopsy to support Erdmann's conclusion that it was not a contributing cause. Riddick was also troubled by the fact that Erdmann did not take notes during the autopsy and had erased the audio tape of his observations. He found this particularly disturbing in view of the fact that neither the autopsy report nor the photographs documented "any find-

---

**6.** The mechanism of death is "the process that causes one or more vital organs or organ systems to fail when a fatal disease, injury, abnormality or chemical insult occurs. It is the functional or structural change the makes independent life no longer possible after a lethal event has occurred." *See* R. Froede, M.D., *Handbook of Forensic Pathology 9* (1982). The same injury may cause death through a variety of mechanisms; therefore, it is possible for forensic pathologists to disagree about the mechanism of death in a case where the cause of death is obvious. *Id.*

**7.** As succinctly stated in one of appellant's briefs before this Court:

To convict appellant of capital murder, the state had to prove beyond a reasonable doubt that he and his codefendants "specifically intended" to cause [the deceased's] death when they punched and kicked him.... To obtain the death penalty, the state had to prove beyond a reasonable doubt that appellant "delib-

erately" kicked or punched [the deceased] "with the reasonable expectation that death would result." ... If the deceased died from a heart attack shortly after the beating, the jury could have reasonably found that his death was not a foreseeable consequence of the blows and kicks that caused it because appellant did not know that [the deceased] had a weak heart.

In proving the murder element of capital murder the State must prove that the defendant "intentionally or knowingly caused the death of an individual," as distinguished from other types of murder which do not require intent *to cause death*. *See* Tex.Penal Code Ann. § 19.02(a)(2) (intent to cause serious bodily injury together with act clearly dangerous to human life); *id.* at 19.02(a)(3) (commission of or attempt to commit felony together with act clearly dangerous to human life).

ing about the condition of [the deceased's] heart, skull or brain that would enable a competent pathologist to rule out heart disease as a contributing cause of death."

On cross-examination of Erdmann in his bill of exception appellant offered evidence that Erdmann's conclusions in an autopsy in another case were found to be invalid when the body was exhumed and a second autopsy performed by another pathologist.

Appellant's defensive theory was to establish reasonable doubt on the issue of intent and/or deliberateness by showing that appellant could not have foreseen that his actions would result in the death of the deceased. Riddick's affidavit supported appellant's theory and seriously questioned Erdmann's conclusions, specifically about the mechanism of death. Other facts pointed to by appellant were also consistent with his theory—evidence that neither appellant nor his companions were armed, appellant's statement in his confession that they "hit the wrong house" and intended to burglarize an unoccupied house, and his statements that the deceased was still alive when they left the scene and he believed the deceased would be alright. Appellant also raised a question through his cross-examination of Erdmann that there was reason to doubt the reliability of Erdmann's work.

In cases holding that a sufficient showing was not made under *Ake,* the defendant typically has failed to support his motion with affidavits or other evidence in support of his defensive theory, an explanation as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was a reason to question the State's expert and proof. *See, e.g., Ake,* 470 U.S. at 85–86, 105 S.Ct. at 1097–98 (petitioner's defense of insanity was announced and trial court was aware of facts supporting that defense—petitioner's behavior before the court was "so bizarre" that competency hearing was ordered, state psychiatrist found petitioner incompetent and recommended that he be committed, petitioner's competence was maintained only by sedation); *Yohey,* 985 F.2d at 227 (defendant's motion for ballistics expert was supported only by affidavit from counsel speculating on firing of weapons and presented no evidence suggesting that findings in autopsy reports were inaccurate or subject to disagreement between experts); *Moore,* 809 F.2d at 717–18 (defendant's request not sufficient where he did not advise court of type of expert sought or role expert would play, he did not offer name of expert that might be available or state what the expert could have contributed to defense); *Edwards,* 868 S.W.2d at 698 (defendant failed to make sufficient showing for DNA expert where motion not supported with affidavit or other proof showing particular need, did not disclose defense theory or discuss issue of misidentification); *State v. Evans,* 710 S.W.2d 530, 534 (Tenn.Crim.App.1985) (defendant's request for ballistics expert distinguished from *Ake* where record contained nothing to indicate unreliability of State's ballistics tests and defendant's contention based entirely on speculation as to what another expert might have found). In cases holding that the defendant was entitled to the appointment of an expert, the defendant has generally made his defensive theory clear to the trial court and supported it with factual allegations and/or evidence that expert testimony would support his theory. *See, e.g., Coker,* 412 N.W.2d at 593 (defendant's request for expert sufficient where defendant informed trial court of intent to rely on intoxication as defense and supported request with facts demonstrating defendant's substance abuse problems and associated seizures); *Dubose v. State,* No. CR–89–359, slip op. at 32, —— So.2d ——, ——, 1993 WL 381482 (1993) (defendant entitled to DNA expert where he specifically alleged what type of expert he needed, how the expert would be useful in challenging the State's case and why the challenged evidence was critical).

In the instant case appellant explained his defensive theory to the trial court and how it could effect the outcome in his case. Appellant supported his motion with the affidavit of an expert, Dr. Riddick, who seriously questioned the findings in the autopsy report as to the mechanism of death and raised questions about the thoroughness and quality of Erdmann's performance in relation thereto. In addition, the expert set forth his own opinion as to the mechanism of death which

was consistent with appellant's defensive theory. Appellant also pointed to facts surrounding the offense that were consistent with his theory. We hold that appellant clearly established that the mechanism of death was to be a significant factor at trial.[8] By overruling appellant's motion for the appointment of a pathologist appellant was denied a "basic tool" essential to developing and presenting his defensive theory.

■ The State argues that appellant did not make a threshold showing under *Ake* because his needs were satisfied by the testimony of Dr. Sparks Veasey and because appellant's defense consisted of impeaching the State's evidence unlike the affirmative defense of insanity where the defendant bears the burden of proof.

■ The State asserts that Veasey's testimony was "exactly the same type of testimony and evidence [appellant] hoped to present from the appointment of an independent pathologist". We note initially that the substance of Veasey's testimony does not impact appellant's threshold showing since the trial court did not know at the time of its ruling on appellant's motion exactly what Veasey would testify to or even whether he would testify.[9] Moreover, the appointment of an expert under *Ake* is not only for that expert's testimony.[10] In *De Freece v. Texas,* 848 S.W.2d 150 (Tex.Crim.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 284, 126

---

8. The importance of the mechanism of death issue was underscored by the State's closing arguments and the jury's deliberations on punishment. Addressing the State's proof on the element of intent in closing arguments at guilt, the prosecutor focused solely on the severity of the beating of the deceased. At punishment the State also focused largely on the nature and severity of the beating in arguing that the evidence established deliberateness. The jury had considerable difficulty reaching a unanimous verdict on the issue of deliberateness. The jury began deliberating on the punishment issues at about 2:20 in the afternoon. Forty-five minutes later they requested copies of appellant's confessions. At nearly 7:30 that evening they informed the court that they had reached a decision on the second and third issues, but were "stalemated" on the first issue. They asked for a definition of "deliberately." At about 9:30 they reported that they were deadlocked six to six on the issue and that each juror "was firm in their belief." The court gave the jury a supplemental charge instructing them to continue deliberating. Shortly after 10:00 the jury asked for transcripts of the testimony of Erdmann, Veasey and the deceased's son. All of these witnesses testified about the deceased's heart condition or issues related thereto. They were finally sequestered for the night shortly after 11:00, they resumed deliberating at 9:00 the next morning and returned a verdict at 1:48 p.m. While these facts do not weigh in our analysis on the threshold showing issue, they evidence the significance of the mechanism of death issue in the final analysis.

9. As noted by the Eleventh Circuit, a reviewing court "must assess the reasonableness of the trial judge's actions [in ruling on an *Ake* motion] at the time he took it." *Moore,* 809 F.2d at 710. There is no indication in the record that the trial court was shown a copy of Veasey's letter in which he reviewed Erdmann's autopsy report prior to ruling on appellant's motion. *See* n. 10,

supra. Appellant stated in his argument before the court that he had a copy of Veasey's letter and that Veasey was "unable to determine the mechanism of death." The State informed the court that there was "a good chance" it would call Veasey to testify "because he questions the mechanism, but I think he would clear up the issue and would agree with everyone else that we talk to, that the cause of death is still homicide." The State further noted that if Erdmann's testimony was "rendered of little value" then Veasey would probably be called. Appellant gave no indication at that time that he intended to call Veasey.

10. We note that Veasey's testimony was of negligible value to appellant. Veasey was the current pathologist for Amarillo, where the instant offense occurred. Veasey was contacted by the State prior to trial for the purpose of reviewing Erdmann's autopsy. In a letter to the State that was admitted into evidence as a defense exhibit, Veasey reported that in his experience "cerebral edema related only to trauma occurring in the absence of intracranial hemorrhage, intracerebral hemorrhage, contusions of the brain, or fractures of the skull, does not occur in adults" and therefore "[t]he exact mechanism whereby [the deceased] died is not clearly apparent to me." Despite this statement, the letter also concluded that "common sense ... clearly dictates that [the deceased] died as a consequence of the blunt trauma which he sustained." In addition Veasey testified that he did not consider mechanism of death to be an important determination to be made by a pathologist. He further testified to factors not included in Erdmann's report but that he believed could support Erdmann's conclusions about mechanism of death. In *De Freece,* we warned of the risk of "generating another witness for the State" by calling an expert witness who is not an appointed defense expert. This appears to be what happened in the instant case.

L.Ed.2d 234 (1993), the State argued that the trial court's appointment of a "neutral" psychiatrist was sufficient to satisfy due process under *Ake*. We rejected the State's contention, concluding that "neutral" experts are insufficient to satisfy due process in our adversarial system:

> [T]he adversarial model rests on the assumption that each party to a dispute, motivated by self-interest, will develop his position to the greatest extent possible . . . thus providing the factfinder an optimal vantage from which to gauge all relevant facts and make an informed decision on the merits.
>
> \*   \*   \*   \*   \*   \*
>
> In an adversarial system due process requires at least a reasonably level playing field at trial. In the present context that means more than just an examination by a "neutral" psychiatrist. It also means the appointment of a psychiatrist to provide technical assistance to the accused, to help evaluate the strength of his defense, to offer his own expert diagnosis at trial if it is favorable to that defense, and to identify the weaknesses in the State's case, if any, by testifying himself and/or preparing counsel to cross-examine opposing experts.

*De Freece*, 848 S.W.2d at 158–59. Accordingly, once he established that cause of death was likely to be a significant factor at trial,

appellant was entitled to more than an expert to testify on his behalf—he was also entitled to "technical assistance . . . to help evaluate the strength of [that] defense, . . . and to identify the weaknesses in the State's case, if any, by . . . preparing counsel to cross-examine opposing experts." *Id.* Appellant did not have access to an expert in that capacity.[11]

■ The State also argues that because insanity is an affirmative defense on which the defendant bears the burden of proof, *Ake* is distinguishable from appellant's case where appellant bore no such burden. We reject that distinction. In *Ake* the Supreme Court emphasized that one of the petitioner's needs for a psychiatrist was to assist in every aspect of his defensive theory including impeachment of the State's psychiatric witnesses. *Ake*, 470 U.S. at 82, 105 S.Ct. at 1095–96. The Court further stated that the petitioner was entitled to the assistance of a psychiatric expert to rebut the State's assertion that he presented a continuing threat to society, yet the petitioner bore no burden of proof as to the special issue. These portions of the Court's opinion in *Ake* recognize that a defensive strategy of exposing weaknesses in the State's proof and presenting the jury with alternative theories is a legitimate and necessary function of our adversarial system.

---

11. We do not suggest that an accused is necessarily entitled to the appointment of an expert who will *agree* with his defensive theory. *See De Freece*, 848 S.W.2d at 159, 160. However, as we stated in *De Freece*, "even a psychiatrist who ultimately believes the accused was sane can prove invaluable by pointing out contrary indicators and exposing flaws in the diagnoses of State's witnesses." *Id.* at 159.

In support of its argument that Veasey's testimony satisfied due process, the State cites *Smith v. Baldi*, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953), which was distinguished in *Ake*. The State relies upon the following quote from *Ake* explaining *Smith*:

> The record in *Smith* demonstrated that neutral psychiatrists in fact had examined the defendant as to his sanity and had testified on that subject at trial, and it was on that basis that the Court found no additional assistance was necessary.

470 U.S. at 84–85, 105 S.Ct. at 1097 (quoting *Smith*, supra, 344 U.S. at 568, 73 S.Ct. at 395). However, the Supreme Court in *Ake* did not

decide the issue of whether the assistance in ·*Smith* was sufficient, but rather just rejected the State's contention that *Smith* supported "the broad proposition that there was no constitutional right to have a psychiatric examination of the defendant's sanity at the time of the offense." The Court emphasized that its disagreement with the State's reliance on *Smith* was more fundamental:

> That case was decided at a time when indigent defendants in state courts had no constitutional right to even the presence of counsel. Our recognition since then of elemental constitutional rights, each of which has enhanced the ability of an indigent defendant to attain a fair hearing, has signaled our increased commitment to assuring meaningful access to the judicial process. . . . *Shifts in all these areas since the time of Smith convince us that the opinion in that case was addressed to altogether different variables, and that we are not limited by it in considering whether fundamental fairness today requires a different result.*

*Id.* 470 U.S. at 85, 105 S.Ct. at 1097 (emphasis added).

## III. Harmless Error

While the State does not specifically argue that a harmless error analysis should be conducted, some of its discussion concerning Veasey's testimony suggests that conclusion. Accordingly, we take this opportunity to decide whether a harm analysis need be conducted upon a determination of *Ake* error. We turn to guidance from the United States Supreme Court in this regard.

■ The case most often cited for the formulation of the federal harmless error rule is *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). There, the California Supreme Court addressed whether "there can ever be harmless constitutional error." *Id.* at 21, 87 S.Ct. at 826. Noting that state harmless error rules are creatures of state law and appropriately apply to errors of state procedure and state law, the Supreme Court assumed responsibility for fashioning the appropriate rule to apply to errors against the United States Constitution.

Recognizing that there may be some constitutional errors that are "unimportant and insignificant" in light of the entire trial, the Court rejected the defendants' contention that all constitutional errors should be deemed harmful, requiring automatic reversal. *Id.* at 22, 87 S.Ct. at 827. Based upon the standard announced in *Fahy v. Conn.*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), "whether there is a reasonable probability that the evidence complained of might have contributed to the conviction," and the common law rule which placed on the beneficiary of the error the burden of proving that no injury was suffered as a result the error, the Court held:

> ... before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

*Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. Despite its holding that constitutional errors are not harmful per se, the Court nevertheless recognized its previous indications that certain constitutional rights are so basic to a fair trial that their violation can never be treated as harmless. *Id.* at 23 & n. 8, 87 S.Ct. at 827–28 & n. 8 (citing *Payne v. Ar-*

*kansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (coerced confession); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (impartial judge).

■ The question of when a constitutional error is immune from the *Chapman* harmless error analysis was addressed in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). *Fulminante* dealt with whether the admission of an involuntary confession was subject to a harm analysis:

> The admission of an involuntary confession—a classic "trial error"—is markedly different from the other two constitutional violations referred to in the *Chapman* footnote as not being subject to harmless-error analysis. One of those violations, involved in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733 (1963), was the total deprivation of the right to counsel at trial. The other violation, involved in *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L.R. 1243 (1927), was a judge who was not impartial. These are structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards. The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial. Since our decision in *Chapman*, other cases have added to the category of constitutional errors which are not subject to harmless error the following: unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); the right to self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 177–178, n. 8, 104 S.Ct. 944 [950–951, n. 8] 79 L.Ed.2d 122 (1984); and the right to public trial, *Waller v. Georgia*, 467 U.S. 39, 49, n. 9, 104 S.Ct. 2210 [2217, n. 9] 81 L.Ed.2d 31 (1984). Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.

"Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Rose v. Clark,* 478 U.S. [570], at 577–578, 106 S.Ct. 3101 [3106], 92 L.Ed.2d 460 (1986) (citation omitted).

It is evident from a comparison of the constitutional violations which we have held subject to harmless error, and those which we have held not, that involuntary statements or confessions belong in the former category. The admission of an involuntary confession is a "trial error," similar in both degree and kind to the erroneous admission of other types of evidence. The evidentiary impact of an involuntary confession, and its effect upon the composition of the record, is indistinguishable from that of a confession obtained in violation of the Sixth Amendment—of evidence seized in violation of the Fourth Amendment—or of a prosecutor's improper comment on a defendant's silence at trial in violation of the Fifth Amendment. When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.

*Fulminante,* 499 U.S. at 309–10, 111 S.Ct. at 1264–65. Thus, if the constitutional violation is such that it impacts the structural underpinnings of the entire trial, it defies subjugation to a harm analysis and calls for automatic reversal. However, if the constitutional violation is akin to "trial error" that is in the nature of the erroneous admission of evidence, the harmless error rule of *Chapman* applies.[12]

This analysis leads us to ask whether the error in the instant case was *structural error* or *trial error.* We conclude the error is structural. We would first point out, as we have previously noted, that the Supreme Court in *Ake* reversed and remanded for a new trial without conducting a harm analysis. *See De Freece,* 848 S.W.2d at 160. It is clear from a reading of *Ake* that the error at issue is structural in nature. The Court's analysis in *Ake* began with a revisiting of the "elementary principle" that every criminal defendant, indigent or otherwise, must have "a fair opportunity to present his defense." *Ake,* 470 U.S. at 76, 105 S.Ct. at 1092. The Court spoke in terms of the "basic tools of an adequate defense" and the "raw materials integral to the building of an effective defense" in concluding that in certain defined circumstances, discussed at length earlier in this opinion, a defense expert is such an element. The Court emphasized that the accuracy of the jury's determination, a substantial interest common to both parties, is "dramatically enhanced" with the appointment of an expert in the circumstances outlined therein. *Id.* at 83, 105 S.Ct. at 1096. We can conceive of few errors that are more structural in nature than one which eliminates a basic tool of an adequate defense and in doing so dramatically affects the accuracy of the jury's determination. We held previously in this opinion that "[b]y overruling appellant's motion for the appointment of a pathologist appellant was denied a 'basic tool' essential to developing and presenting his defensive theory." The structural underpinnings of appellant's trial, from beginning to end, were affected by his inability to present an effective defense.[13] Accordingly, we hold

**12.** While the harmless error rule applies to errors that are evidentiary in nature, clearly not all such errors are in fact harmless. As the Court in *Chapman* stated, "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under Fahy, be conceived of as harmless." *Chapman,* 386 U.S. at 23–24, 87 S.Ct. at 828.

**13.** We have recognized the relationship between the fundamental right to effective assistance of counsel and the indigent's right to the appointment of an expert. *McBride v. State,* 838 S.W.2d

248, 251–152 (Tex.Cr.App.1992). In *McBride,* we determined the trial judge erred in denying the defendant's motion for the appointment of a chemist and remanded the case to the Court of Appeals "to determine whether the error is *subject to* a harm analysis...." *Id.* at 252. On remand the Court of Appeals held the error was not subject to a harm analysis because

... any attempt to subject the error in this cause to a harm analysis would not be successful, for it would be extremely difficult, if not

that the denial of the appointment of an expert, consistent with *Ake*, amounts to structural error which cannot be evaluated for harm.

Having held that appellant made a sufficient threshold showing that he was entitled to the assistance of a pathologist to assist in the evaluation, preparation and presentation of his defense, we reverse the judgment of the trial court and remand for a new trial. *See Ake*, supra.

McCORMICK, P.J., and WHITE and KELLER, JJ., dissent.

MANSFIELD, Judge, concurring.

I concur in the result reached by the majority in this case. Under the unusual facts presented, Appellant's due process rights required that he be provided a state-funded pathologist. I write separately, however, because the majority does not provide adequate guidance for the trial courts with respect to the three factors in the balancing test established by *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). I also write as to whether the federal harmless error rule applies to a violation of the standards established in *Ake*.

### I. *The Ake Test*

The United States Supreme Court in *Ake* set forth three factors or tests that must be used to determine when due process requires a state to provide an indigent defendant with the services of a testifying psychiatrist.

The first factor is the defendant's interest in the accuracy of the criminal proceeding against him. The second factor is the State's interest in having a fair and accurate adjudication of criminal cases without wasteful or unnecessary expenditures of state funds. Providing indigent defendants with experts can be expensive and the State has a right to inquire as to whether a defendant's request for same is constitutionally required. The majority opinion correctly states that *Ake* applies to non-psychiatric experts such as pathologists, investigators and DNA analysts.

The third factor simply requires the court to evaluate the probable value of the assistance of the expert sought and the risk of error if such assistance is denied. *Ake* at 78, 105 S.Ct. at 1093–94.

### A. *Factors One and Two:*
### *The Interests of the Defendant and the State*

There is certainly little doubt that the accused always has an interest in an accurate result in the proceedings against him. The State has a strong interest in the integrity of the system that remains the same in each case. However, these two interests are not identical, as the majority opinion seems to imply.

It is clear that *Ake* requires a court to weigh and balance the competing interests of the State and the accused on a case-by-case basis. The State's interest in preserving its resources can be protected only by providing experts to indigent defendants who meet the *Ake* requirements.

The private interest in the accuracy of a criminal proceeding that places the defendant's life at risk—the situation both in *Ake* and in this case—is extremely compelling. The interest of the State in an accurate result in a death penalty case is equally strong. Accordingly, the burden an indigent defendant on trial for his life must meet in order to validate his request for a state-funded expert should be reasonable and the weight given to the State's concern for cost should be given minimal weight. The interest in accuracy is considerably less in non-capital cases, especially in lower level felony or misdemeanor cases where the accused, if convicted, faces a short period of incarceration, or even a fine and/or a probated sentence. In such cases, the accused's burden of proof to support his request for a state-funded expert should be clear and convincing evidence and great weight should be given to the State's concern for cost.

Some would question the propriety of injecting the issue of cost into due process

---

impossible, to ascertain with any degree of certainty the impact of the error on the jury.

*McBride v. State*, 873 S.W.2d 115, 116 (Tex. App.—Amarillo 1994).

analysis. Unfortunately, the State's resources are limited and indigent defendants cannot be provided with whatever assistance they request. The United States Supreme Court itself has noted that cost may be taken into account in determining whether the benefit of providing an additional safeguard to an individual is outweighed by the cost to society as a whole. See *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). I do not believe that *Ake* or due process requirements mandate that an indigent defendant charged with a misdemeanor or a state jail felony be provided an expert costing $5,000. Chief Justice Burger, in his concurrence, stated, "Nothing in the Court's opinion reaches non-capital cases." *Ake*, 470 U.S. at 87, 105 S.Ct. at 1098.

### B. *Factor Three: Probable Value and Risk of Error*

The third factor in the *Ake* balancing test requires the court to determine the probable value of the expert assistance sought and the risk of error in the proceeding if such assistance is not offered. *Ake*, at 79, 105 S.Ct. at 1094.

The majority states correctly that the accused has the burden of demonstrating need for the expert's assistance. Whether or not the defendant can receive due process of law without a state-funded expert is an issue for the trial judge to decide. The defendant must show that the issue on which he seeks expert assistance is likely to be a "significant factor" at trial. Second, he must explain what value the expert will add to his defense. Finally, the defendant must demonstrate how, and to what extent, failure to provide the expert will create a risk of an inaccurate verdict.

The role of the trial judge is to balance the factors described in the preceding paragraph against the parties' interests in accuracy (taking into account the offense or offenses for which the accused is on trial) and the cost of providing the expert requested. Only by doing all of this can the trial judge determine if due process requires the granting of defendant's request for a state-funded expert.

The facts of this case are unique as ample evidence exists questioning the competency of the State's pathologist. The record shows that the issue of the mechanism of the death of the deceased is open to question. Evidence that the deceased did not die as the result of blows to the head, but rather due to a heart attack (the deceased had a serious heart condition), would support appellant's defense that he did not intend to kill the deceased by beating him and that he did not act deliberately with the reasonable expectation that death would result.

Denial of the assistance of a state-funded expert on the issue of the mechanism of death—clearly an issue likely to be a "significant factor" at trial of a capital case—denied appellant due process and, based on *Ake*, requires the reversal of the judgment of the trial court and remand for new trial.

### II. *Harmless Error*

The majority presents, but does not resolve, the issue of whether or not the constitutional violation in this case is subject to the federal harmless error rule. For the following reasons, I believe that it is.

The United States Supreme Court has addressed whether or not a particular error is subject to harm analysis on numerous occasions. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) is often cited as the first case in which the federal harmless error rule was developed. In *Chapman* the Supreme Court held that it, and not the states, would develop a harmless error rule to deal with errors that violate the U.S. Constitution. The Court held: " . . . that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. It is important to note that the Court *specifically* rejected Chapman's claim that all federal constitutional errors are harmful per se, thereby requiring automatic reversal.

The Court since *Chapman* has dealt extensively with the issue of harmless error. In several instances the Court held that if it is clear beyond a reasonable doubt, e.g., overwhelming evidence of guilt existed and the jury would have returned a verdict of guilty

in the absence of the error, then the error was harmless. *U.S. v. Hastings,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987).

However, certain "structural" errors are not subject to the harmless error rule. For example, violation of the right to counsel, *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); a constitutionally defective instruction on reasonable doubt, *Sullivan v. Louisiana,* 508 U.S. ——, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); a coerced confession, *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); a biased judge, *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); exclusion of potential jurors on the basis of race, *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

In *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Court held that a confession of a prisoner, motivated by a genuine fear of violence, to a fellow inmate who was a paid FBI informer who offered to "protect" him from this violence in exchange for the confession was involuntary and not harmless error. It is important to note that five members of the Court held that the admission at trial of an involuntary confession is subject to harmless error analysis. *Fulminante,* at 280–81, 111 S.Ct. at 1261.

The Court in *Ake* nowhere holds that the failure to provide the accused with a state-funded expert in violation of his due process rights is an error not subject to harmless error analysis. In fact, the Court did *not* perform a harm analysis and absence of such an analysis, I believe, allows this Court to perform a harm analysis under *Chapman.* The error described in *Ake* is arguably a "trial error" similar in impact to that of the admission of an involuntary confession. In any event, it seems logically questionable to differentiate between "trial errors" and "structural errors" given the result may be the same in either case.*

---

* A more intellectually honest approach would be to designate certain errors as errors per se requiring automatic reversal such as the denial of

### Conclusion

As previously stated, I believe that *Ake,* as applied to this case, requires reversal and remand for a new trial because denial of the defendant's right to a state-paid pathologist could not be shown to be harmless error beyond a reasonable doubt. A similar result would be mandated under Rule 81(b)(2) Tex. R.App.Proc. in the absence of *Ake.*

---

the right to counsel, denial of the right to a jury selected in a racially nondiscriminatory manner, and denial of the right of self-representation.