

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00187-CR

Jose Arturo **VERGARA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 406th Judicial District Court, Webb County, Texas
Trial Court No. 2011CRS000560
Honorable Mark R. Luitjen, Judge Presiding

Opinion by:   Sandee Bryan Marion, Justice

Sitting:      Catherine Stone, Chief Justice
              Sandee Bryan Marion, Justice
              Rebeca C. Martinez, Justice

Delivered and Filed:  February 27, 2013

AFFIRMED

Appellant, Jose Arturo Vergara, was convicted by a jury of continuous sexual abuse of a child and was assessed a life sentence. In four issues on appeal, appellant contends (1) the trial court erred in denying his request to authorize the expenditure of county funds to provide expert assistance in his defense, (2) the language of the amended indictment created a situation where the offense could not be proved as stated, (3) the evidence was insufficient to support a conviction, and (4) the trial court abused its discretion in allowing the State's expert witness, Dr. Gregorio Pina, III, to testify over appellant's objection. We affirm.

**EXPERT ASSISTANCE**

In his first issue, appellant contends the trial court erred in denying his request for county funds to provide expert assistance in his defense. Appellant argues these funds were needed to controvert the findings and opinions of the State's experts. He also argues these funds were necessary to be on "equal footing" with the State, thus assuring he received a fair trial.

Appellant filed a pre-trial "Motion for Funds for Defense Expert(s)" after the State designated two experts—Amando Garza, M.D., and Gregorio Pina, III, Ph.D. Dr. Garza, a pediatrician, performed a medical assessment on the complainant. Dr. Pina, a psychologist, performed a psychological assessment and also conducted therapy sessions with the complainant. Appellant states on appeal that at the hearing on the motion he "made a threshold showing that medical and psychological experts were needed by the defense as the State's case would be buttressed, if not dependent, on the testimony of the pediatrician who examined the alleged victim and on his findings, and by the psychologist who assessed the child and provided therapy thereafter." He argues an expert in his defense would likely have made a difference in the outcome of the trial.

The State must provide a defendant with the basic tools to present his defense, but need not "purchase for an indigent defendant all the assistance that his wealthier counterparts might buy." *Rey v. State*, 897 S.W.2d 333, 337 (Tex. Crim. App. 1995) (en banc) (citing *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). There are three factors to be examined in determining whether a defendant is entitled to the appointment of an expert: (1) the private interest that will be affected by the action of the State, (2) the governmental interest that will be affected if the safeguard is to be provided, and (3) the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. *Ake*, 470 U.S. at 77.

As to the first factor, the private interest that will be affected by the action of the State is obviously very high.  Appellant was charged with a serious offense for which he was assessed a life sentence.  As to the second factor, the State has an interest in the accuracy of the proceedings that "is obvious and weighs heavily."  *Rey*, 897 S.W.2d at 337 (citing *Ake*, 470 U.S. at 78).  The third factor, the defendant's threshold showing, is the "weightiest consideration."  *Rey*, 897 S.W.2d at 339.  A defendant must show how an expert would assist in his defense before he is entitled to have one appointed.  *Rodriguez v. State*, 906 S.W.2d 70, 72 (Tex. App.—San Antonio 1995), *pet. dism'd, improvidently granted*, 924 S.W.2d 156 (Tex. Crim. App. 1996).  The burden is on the defendant to make a threshold showing of the need for the expert's assistance.  *Griffith v. State*, 983 S.W.2d 282, 286–87 (Tex. Crim. App. 1998) (en banc).  The defendant must provide the trial court with information about what evidence will be presented against him and how the appointment of an expert will assist him.  *Rodriguez*, 906 S.W.2d at 72–73.

"In cases holding that a sufficient showing was not made under *Ake*, the defendant typically has failed to support his motion with affidavits or other evidence in support of his defensive theory, an explanation as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was a reason to question the State's expert and proof."  *Rey*, 897 S.W.2d at 341.  "In cases holding that the defendant was entitled to the appointment of an expert, the defendant has generally made his defensive theory clear to the trial court and supported it with factual allegations and/or evidence that expert testimony would support his theory."  *Id*.

In *Rey*, the appellant requested an expert to assist him in his defense, claiming the manner in which the victim died would be a significant factor at his trial for murder.  In requesting the expert, the appellant argued he would need his own forensic pathologist to present a defense based upon a theory that the victim had died of a heart attack, not from a blow to the head.  This

expert testimony, he argued, would support his defense that he did not intend to kill the victim by beating him to death. The appellant named a specific expert and presented an affidavit from him stating his opinions on the manner of death and also asserting that the State's witness had failed to investigate the victim's heart condition as an alternative cause. The trial court denied his motion. The Court of Criminal Appeals reversed, concluding the appellant was entitled to the appointment of an expert because he had supported his motion with the affidavit of the expert he sought and "explained his defensive theory to the trial court and how it could effect [sic] the outcome in his case." *Id*. The court noted, "the expert set forth his own opinion as to the mechanism of death which was consistent with appellant's defensive theory." *Id*. at 341–42.

Here, the appellant did not present evidence or attach affidavits to his motion to request funds demonstrating to the trial court what expert testimony would support his theory. At the hearing, appellant's trial counsel stated:

> [Trial counsel]: So what we're asking for, Your Honor, is some help, of course, Judge, to be allowed to try to get on equal footing, at least, with the State and try to find some individual or individuals to be able to look at the evaluation that was done by Dr. Garza — or the examination, rather; the — and any supporting medical records; the evaluation that was done by — or assessment that was done by Dr. Pina and any accompanying medical — or, rather, documentation by Dr. Pina; and also the forensic examination itself, and to review that, Judge.
>
> So we need — obviously, Judge, we'd like to get somebody to be able to review those matters and — in an attempt, obviously, to rebut any kind of opinions — opinion or opinions that the — that these individuals might testify to.

Citing case law in response to appellant's request, the trial court stated:

> [The court]: But that's very general. In other words, what it says there, *upon a showing that matters that the expert will address are likely significant factors*. In other words, that you have an issue about a specific opinion by the doctor or by the expert that you want to challenge based on information that you have. Not just, *Okay. Well I want to hire someone just to give me a different opinion than what they're going to give*. I mean, that's not what it's there for.[1]

---

[1] Emphasis in reporter's record.

Appellant's trial counsel did not make his "defensive theory clear to the trial court" and support it "with factual allegations and/or evidence that expert testimony would support his theory." *See Rey*, 897 S.W.2d at 341. Instead, appellant's trial counsel made a very broad request for an expert to "rebut" the State's witnesses without presenting any defensive theory or what a defense expert would state. We conclude appellant did not make a sufficient "threshold showing" to demonstrate to the trial court his entitlement to funds for an expert and, therefore, the trial court did not err in denying his request.

### INDICTMENT

In his second issue, appellant argues the language of the indictment as amended created a situation where the offense could not be proven as stated. Specifically, appellant argues the amendment of Count I of the indictment created a "fatal variance" between the elements as alleged in the indictment and the evidence presented by the State. Appellant asserts that because the indictment stated that the period of time in which the offense of continuous sexual abuse of a child occurred was "from on or about September 9, 2008 to on or about November 1, 2009, that being a period *that was 30 days in duration*," the State was unable to prove the acts of sexual abuse occurred in a period of time that was *more than 30 days in duration*, as required by Penal Code section 21.02. *See* TEX. PENAL CODE ANN. § 21.02 (requiring the acts of sexual abuse must have been in a time period that is 30 days or more in duration).

At the hearing on the final motion to amend the indictment, the trial court read the indictment with the amendments into the record. Although the written amendments demonstrate the proper language, the trial court mistakenly read that appellant "did then and there during a period that was 30 days in duration . . ." commit the alleged offenses. However, after reading the amended indictment, the court asked if there were any objections. Appellant's counsel responded: "As read by the Court, Your Honor, and as requested by the State, we have no

objections." Accordingly, we conclude appellant waived this issue for appeal; however, despite appellant's waiver, the record demonstrates the following:

The written amended indictment contained the proper "more than 30 days in duration" language. The oral recitation of the indictment at the outset of trial stated the appellant "did then and there during a period that was 30 days or more in duration, to wit: From on or about the 9th day of September, A.D., 2008, through the 1st day of November, A.D., 2009 . . . commit two or more act of sexual abuse . . . ." The charge read to the jury by the trial court indicated, "Now, if you find from the evidence beyond a reasonable doubt, that from the 9th day of September, A.D., 2008, through the 1st day of November, 2009, during a period that was more than 30 days in duration . . . the [appellant] . . . did then and there commit two or more acts of sexual abuse . . . ." The written charge of the court read, "Now, if you find from the evidence beyond a reasonable doubt, that from the 9th day of September, A.D., 2008, through the 1st day of November, 2009, during a period that was more than 30 days in duration . . . the [appellant] . . . did then and there commit two or more acts of sexual abuse . . . ."

The record thoroughly demonstrates the language "more than 30 days in duration" was alleged in the indictment. Therefore, despite waiver, we conclude the language of the indictment as amended contained the correct "more than 30 days in duration" language and appellant's argument is without merit.

## SUFFICIENCY OF THE EVIDENCE

In his third issue, appellant argues the evidence was insufficient to support a conviction of continuous sexual abuse of a child.

A person commits the offense of continuous sexual abuse of a young child if during a period that is thirty or more days in duration, the person commits two or more acts of sexual abuse, and at the time of the commission of each of the acts of sexual abuse, the actor is

seventeen years of age or older and the victim is a child younger than fourteen years of age. TEX PENAL CODE ANN. § 21.02.

In reviewing for sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). We give deference to the jury's credibility and weight determinations, and to their duty to resolve conflicts in the testimony. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We defer to the jury's determination of the weight to be given to contradictory testimonial evidence because resolution is often determined by the jurors' evaluation of the witnesses' credibility and demeanor. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000) (en banc), *overruled on other grounds by Brooks v. State*, 323 S.W.3d 893, 912–13 (Tex. Crim. App. 2010).

The State presented the testimony of five witnesses including the detective assigned to the case, the "outcry" witness, the doctor who examined the complainant, the psychologist who evaluated the complainant, and the complainant herself.

The complainant, "Pearl,"[2] is appellant's granddaughter. Pearl testified appellant began sexually abusing her in 2008 when she was eight years old and in the third grade, and the abuse continued until 2009 when she was nine years old and in the fourth grade. Pearl did not have a relationship with appellant until the summer of 2008. Appellant began picking Pearl up after school when Pearl's mother began working late. Pearl testified the first incident of abuse occurred after appellant picked her up from school during the summer before her third grade.[3] She stated she was watching television on the bed when appellant entered the room and told her

---

[2] To protect her identity, the complainant was referred to as "Pearl" at trial. We will also refer to her as Pearl.

[3] Pearl testified she attended an after-school day-care program at the school that went on throughout the year, not just during the school year. Pearl's teacher testified to the same.

to lie down and remove her underwear. Pearl stated, "[a]fter that, he put his middle part in mine." Pearl demonstrated to the jury what that meant by using anatomically correct dolls. Pearl testified she remembered the first time this happened was in the summer and she was wearing her school uniform. She further stated she knew it was in the summer because it was before her mother's birthday, which was on October 25th, and that appellant had taken her to the flea market to get her mom some sunglasses for her birthday. Pearl testified appellant "put his middle part in [hers]" numerous times until she was in the fourth grade.

Pearl testified appellant also put his "private part" in "her back middle part." Pearl testified in detail about the first time this occurred. She stated she was eight years old and in the third grade and the incident occurred at her apartment after appellant picked her up from school. Pearl testified appellant told her to lie down on the bed face down and then he "put his middle part in my back part." She testified she remembered staring at the floor and it hurting a lot. She testified this also happened numerous times over the next year.

Pearl testified that appellant would also put "his middle part" in her mouth on multiple occasions. She testified "a white, clear liquid" would come out and she stated: "When he was done, I would go to the kitchen sink and spit it out. And the water, I would rinse out my mouth."

Pearl also testified that appellant would use his finger to touch her, and that she was in the fourth grade the first time it happened. She testified it occurred on a weekend, but while her mother was at work because she sometimes worked on Saturdays. Pearl stated:

A:     After that, he — first, he put his middle part in mine.
Q:     Okay.
A:     And then after, he got baby oil and put some on his finger and rubbed it on my middle.

Pearl further testified that appellant would "kiss" her "in [her] mouth" and on her "front middle part," and that appellant would also make her touch his "middle part" with her hand. Pearl also

demonstrated for the jury how appellant would make her touch him with her hand with anatomically correct dolls. She testified this happened multiple times.

Pearl testified the last time appellant sexually abused her was on a Saturday and it occurred sometime after her ninth birthday, which was on August 9, 2009. Pearl stated appellant would threaten her and tell her that her mother would never believe her if she told. She also stated appellant threatened to "take [her] to his girlfriend's house" and "make [her] do things that [she] didn't want to" with his girlfriend if she told. Pearl eventually told a teacher at school about the abuse in November 2009.

Although Pearl was able to remember general time periods, she did not give any specific dates on which any specific acts occurred. The prosecutor asked her about this at trial:

Q:      . . . Why don't you remember all of the details of all the bad things that your grandfather did to you back in 2008 and 2009?
A:      Because it was so long ago that after the third week I just forgot about it. And I didn't want to remember it anymore.
Q:      Why didn't you want to remember it anymore?
A:      Because every time that I thought about it, it made me feel worse inside.

Marta,[4] the "outcry" witness, was a teacher at Pearl's elementary school. Marta knew Pearl from school and the after-school day-care program. She first met Pearl when Pearl was in the second grade. Marta stated that Pearl's mother would pick her up from school, but sometime during the third grade Pearl's grandfather, appellant, began to pick her up and he continued to pick her up into her fourth grade year. Marta testified appellant would frequently arrive early to pick Pearl up, and would sometimes wait in the cafeteria until she was released from school at 2:45 p.m. Marta testified Pearl told her about the sexual abuse on November 23, 2009, when Pearl was in fourth grade. Marta testified:

---

[4] For the protection of the identity of the minor child, all adults will be referred to as either appellant or by their first name only.

Q:    Now, when she's sitting next to you, what are the allegations that she stated? What did she state to you in regards to sexual abuse?
A:    She stated to me that her grandfather was doing sexual — she would spell out these words because she felt uncomfortable.
Q:    Okay. What words are we talking about specifically?
A:    We're talking about S-E-X. She said that [sic] grandfather was making her have sex with him; that he would make her do the S-U-C-K-I-N-G in his middle private. And he would tell her to take off her underwear. And if she hesitated, he would tell her, If you don't, I'm going to take you by my girlfriend's house; who apparently walked around naked, and say, You're going to make out with her.

Marta testified she called Child Protective Services after Pearl informed her about the abuse.

Dr. Amando Garza, a pediatrician, testified that he examined Pearl on December 15, 2009, after she made the outcry of sexual abuse. Garza testified his examination revealed abnormalities to the hymen. Garza testified the notes of his examination revealed "findings compatible with allegations of molestation" and "scarring to hymen compatible with sexual abuse." Garza testified, however, that he could not tell with any medical degree of certainty what caused the tear. He stated "compatible with" meant it was "possible" it was caused by the sexual abuse described by Pearl, but that it was not "certain."

Appellant presented the testimony of three witnesses including a friend, appellant's employer, and appellant's daughter—Pearl's aunt. Appellant's friend, Juan, testified that appellant lived with him from "2008 until now." Juan also testified that he did not think appellant had any kind of contact with Pearl's mother in 2008 or 2009. He testified he provided transportation for appellant until he got his own motorcycle in May 2008. Juan stated he was unaware of appellant ever babysitting Pearl or going over to her house, and that, to his knowledge, appellant never picked Pearl up from school. Juan's testimony, however, conflicts with the testimony of Marta, who stated she witnessed appellant pick Pearl up from school on numerous occasions and that she would see him waiting in the cafeteria for Pearl before school was let out at 2:45 p.m.

Appellant's employer, Adolfo, testified appellant worked for him from August 26, 2008 to October 22, 2009. Adolfo testified that during that time appellant would work five days a week, almost every week. Adolfo's testimony also conflicts with Marta's, who testified she witnessed appellant pick up Pearl from school on weekdays. Adolfo, however, conceded appellant would not necessarily stay until 5:00 p.m. every day.

Cynthia, appellant's daughter and Pearl's aunt, testified in appellant's defense. In regards to Pearl's truthfulness and credibility, Cynthia testified:

> Q:     [Cynthia], would you say that you had gotten to know the child well enough, up until recently, where you could make an opinion with regards to the child's truthfulness?
> A:     Yes.
> Q:     Okay. And what would that opinion be of, [Cynthia]? Only with regards to the child's truthfulness. And I'm talking about the child "Pearl."
> A:     I mean, she's capable of lying too.
> Q:     Okay. But do you have an opinion, [Cynthia]?
> A:     Opinion of her?
> Q:     No. With regards to — only with regards to truthfulness.
> A:     Can you be more specific of what opinion you want?
> Q:     Well, she was — the question is truthful, or not truthful, would be the answer to that — to my question
> A:     It depends if she's not being threatened, she can be truthful, or she can lie.
> . . .
> Q:     But, [Cynthia], my question, again, is your opinion. What is your opinion of that? Based again, on your contacts, and experience, and relationship with the child.
> A:     She's not truthful.
> Q:     Okay.

Cynthia also testified that the entire family had a gathering for Christmas in 2009 and that both appellant and Pearl were present. She testified: "[Pearl] even wanted to go outside to see my dad." This was approximately one month after Pearl made the outcry.

Viewing all of the evidence in the light most favorable to the verdict, we conclude there was sufficient evidence to convict appellant of continuous sexual abuse of a child. Pearl testified in detail to multiple instances of abuse spanning between her third grade and fourth grade school

years.  Her testimony indicated a period of time that was more than thirty days in duration.  Proof of exact dates is not required to be convicted of the offense of continuous sexual abuse.  *See* TEX. PENAL CODE ANN. § 21.02(d) ("[M]embers of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed."); *see also Smith v. State*, 340 S.W.3d 41, 48 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("The Legislature recently created the offense of continuous sexual abuse of a child in response to an expressed need to address sexual assaults against young children who are typically unable to give precise dates when there are ongoing acts of sexual abuse.").  Appellant presented witnesses in his defense; however, the jury is the sole judge of credibility, and we defer to their determinations.  *Hooper*, 214 S.W.3d at 13.

## EXPERT TESTIMONY

In his fourth issue on appeal, appellant argues the trial court abused its discretion when it allowed Dr. Gregorio Pina, III, to testify over appellant's objection.

Dr. Pina is a licensed psychologist who specializes in the areas of child sexual abuse and sex offenders.  Appellant did not object to Dr. Pina's qualifications, but instead focused on the reliability of his methodology.  Specifically, he argues on appeal that because his methodology was unreliable, it was also not relevant.

Both this court and the Court of Criminal Appeals have determined the area of psychology is a "soft science."  *See Weatherred v. State*, 15 S.W.3d 540, 542 n. 5 (Tex. Crim. App. 2000) ("The 'soft' sciences, in contrast, are generally thought to include such fields as psychology . . . ."); *Chavarria v. State*, 307 S.W.3d 386, 392 (Tex. App.—San Antonio 2009, no pet.) (concluding the "soft" science standard applies to Dr. Pina's expert testimony in a child sexual abuse case).  Therefore, in determining whether Dr. Pina's testimony was reliable, the trial court should have made an inquiry into the following: (1) whether the field of expertise is a

legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies on or utilizes the principles involved in the field. *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999) (applying these factors to "soft sciences"). We review a trial court's ruling on the admissibility of scientific expert testimony for an abuse of discretion. *Weatherred*, 15 S.W.3d at 542.

Research in the field of behavioral characteristics of sexually abused children is recognized as a legitimate field of expertise. *See Cohn v. State*, 849 S.W.2d 817, 818–19 (Tex. Crim. App. 1993) (en banc); *Chavarria*, 307 S.W.3d at 392. Dr. Pina's testimony about his examination and evaluation of Pearl was within the scope of his expertise as a psychologist specializing in child sexual abuse. As to whether his testimony relied on or utilized principles involved in that field, Dr. Pina was questioned as follows:

> Q:     So, you're saying that you've got your own method. Is that what you're saying?
> A:     No, I'm not. I'm saying I'm following a method that is the most recently taught at universities, and more scientific. And so, I may use it. But I may not be able to use it across all the different ages. For example, the children that come to see me.
> Q:     Okay. So, then you use different methods for different children, not just one particular children [sic] —
> A:     I disagree. It's the same method, but you tweak it to the individual, and the family, of course.

Dr. Pina also testified that his methodology followed principles recognized by his peers in child sexual abuse psychology. We conclude Dr. Pina's testimony met the three factors of *Nenno* and, thus, the trial court did not abuse its discretion in allowing Dr. Pina to testify.

## CONCLUSION

We overrule appellant's issues on appeal.  We affirm the judgment of the trial court.


Sandee Bryan Marion, Justice

DO NOT PUBLISH