

# NUMBERS 13-21-00164-CR & 13-21-00165-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

DON LEE ROSALEZ,                                              Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

## On appeal from the 36th District Court
## of San Patricio County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Tijerina**
**Memorandum Opinion by Justice Hinojosa**

Appellant Don Lee Rosalez was convicted on one count of continuous sexual

abuse of a young child[1] and two counts of aggravated sexual assault,[2] each a first-degree

---

[1] Appellate cause number 13-21-00164-CR.

[2] Appellate cause number 13-21-00165-CR.

felony. *See* TEX. PENAL CODE ANN. §§ 21.02(b), 22.021(a)(2)(B). He was sentenced to prison terms of sixty, forty, and forty years for the respective offenses, and the trial court ordered the sentences to be served consecutively. On appeal, Rosalez argues: (1) the trial court should have granted his request for the appointment of an expert witness; (2) the sentences should not have been ordered to run consecutively; (3) his trial counsel provided ineffective assistance by failing to object to a single jury trial on both indictments; and (4) his cumulative 140-year prison sentence constitutes cruel and unusual punishment. We affirm.

## I. BACKGROUND

Rosalez was charged in two indictments returned by a San Patricio County grand jury on August 13, 2019. The first indictment alleged that, on or about May 1, 2016 through June 30, 2018, Rosalez committed two or more acts of sexual abuse against A.H., a child under fourteen years of age. *See id.* § 21.02 (defining the offense of continuous sexual abuse of a child).[3] Count I of the second indictment alleged that, on or about June 15, 2018, he intentionally and knowingly caused the penetration of the sexual organ of D.R., a child under fourteen years of age, by his sexual organ. *See id.* § 22.021(a)(2)(B) (defining the offense of aggravated sexual assault of a child). Count II of the second indictment alleged that, on or about the same day, Rosalez intentionally and knowingly caused the penetration of D.R.'s mouth by his sexual organ. *See id.*

On June 9, 2020, Rosalez's counsel filed a motion in limine seeking to bar the State from eliciting any testimony constituting an opinion on the truthfulness of the child

---

[3] The first indictment alleged specifically that Rosalez committed various acts of indecency with a child and various acts of aggravated sexual assault against A.H. *See* TEX. PENAL CODE ANN. § 21.02(b) (listing offenses which constitute "acts of sexual abuse" for purposes of the continuous sexual abuse of a child offense).

2

witnesses. That same day, counsel also filed a "Motion for Approval of Expert Witness Funds" and a trial brief in support thereof. The motion and brief argued that Rosalez is indigent but that the appointment of an expert witness "in the area of CAC [Children's Advocacy Center] Forensic Interview" would be necessary for his defense. The motion stated: "Counsel . . . has determined through investigation and interviews with unnamed witnesses that suggest [sic] that the complainant may have been subjected to adverse influences that might have created a coercive environment in which she would be encouraged and pressured in various ways to make false allegations." In his trial brief, Rosalez noted: "When the defense to a charge of sexual abuse against a child is that the child's allegations were manipulated and the result of acrimony that resulted from a divorce, an attorney can be ineffective for not calling an expert witness to discuss this defensive theory." The State filed responses to the motion in limine and motion to appoint an expert witness.

At a videoconference hearing on September 22, 2020, defense counsel argued that, because the State would be "basing their entire case on the statement of the victims and the interviews by the SANE [sexual assault nurse examination] practitioner," it "would be in the best interest of justice [for] an expert witness [to] review those interviews and make sure that the proper protocols were done, that there was no leading or misinformation provided by that interviewer." In response, the State argued that Rosalez failed to show the need for an expert witness "to advance a specific defensive theory." The trial court denied the motion.

Prior to the beginning of trial on May 4, 2021, the prosecutor agreed to admonish the State's expert witnesses not to opine on the veracity of the complainants' statements

3

in their forensic interviews, and the trial court granted Rosalez's motion in limine. Trial then began on both indictments, without objection by defense counsel.

Andrea Hernandez testified that she had been in a dating relationship with Rosalez for twelve years, and they had four children together. Hernandez, Rosalez, the four children, and A.H.—Hernandez's older daughter from a previous relationship—lived together for about nine years, first in Portland and then in Gregory. From 2014 until early 2020, Hernandez had full-time employment but Rosalez was only sporadically employed; therefore, Rosalez was usually home alone with the children during her working hours. Hernandez stated that she and Rosalez argued frequently, and the arguments would "[s]ometimes" get violent.

In January of 2019, Hernandez found on Rosalez's cell phone a "half naked" photo of twelve-year-old A.H. "in a sports bra and panties in the bathroom undressing."[4] According to Hernandez, Rosalez "tried to say that it was just one day, that he was drunk, and it happened." Hernandez told Rosalez their relationship was over and asked him to leave, and he left a few days later. She said she did not contact the police at that time, and she let Rosalez stay for a few days after she found the photo, because she did not know anything else was occurring between Rosalez and A.H.

On June 8, 2019, while she was getting her children ready for school, Hernandez heard A.H. crying in her room with the door locked. Hernandez used a "card" to unlock the door. A.H. told her mother "she didn't want to live" and "was having nightmares of the things that [Rosalez] did to her." A.H. was not forthcoming with details, so Hernandez

---

[4] Hernandez conceded on cross-examination that she did not preserve the photo because "[t]hat's just not my reaction I had at the moment."

4

brought her to her grandmother's house. On the way there, A.H. told Hernandez that "he had been putting it in her." Hernandez called the Gregory Police Department. She later took A.H. to the Children's Advocacy Center for an interview and to Driscoll Children's Hospital for a sexual assault examination.

After Rosalez left, Hernandez's mother cared for the children while she worked. She did not allow Rosalez to see A.H. after the June 8 outcry, but she did allow Rosalez to see the four children he shared with her during that time. Hernandez testified that she took A.H.'s phone away on June 8, 2019, so that Rosalez could not contact her. She looked through A.H.'s phone and found some "disturbing" texts between A.H. and D.R., Rosalez's daughter from a prior relationship. Hernandez said D.R. would visit frequently when Rosalez lived with the family. Hernandez later received a phone call from April Sutherland, D.R.'s mother. Hernandez stated that, prior to June 2019, she did not have a relationship with Sutherland, but they are "best friends now."

Sutherland testified that she and D.R. moved from Corpus Christi to Austin in 2016, but she continued to take D.R. to visit Rosalez in Corpus Christi because "[D.R.] wanted to see her father." According to Sutherland, on an unspecified date, D.R. "came out of her bedroom crying and she said that [Rosalez] wanted to speak to me because she had the phone." Rosalez "told me he was not going to be able to see [D.R.] for a while or speak to her for a while because he had to go away." As to the photo of A.H. found on Rosalez's phone, Rosalez told Sutherland that

> he was playing a joke and was recording himself using the restroom. . . . So he assumed that the video must have been running on the phone when he left and [A.H.] had gone to use the restroom, and that's how the video [sic] could have possibly shown up on his phone.

5

Sutherland agreed that this story sounded "weird," so she contacted Hernandez. Hernandez advised Sutherland about the disturbing text message exchange with D.R. on A.H.'s phone. Screenshots of the text messages were entered into evidence and published to the jury. In the text messages, D.R. told A.H. that Sutherland "called someone on [Rosalez] and now he is in trouble and now [I] will never see or hear from him again." A.H. explained that Rosalez "did something bad to me ever since I was 10" and "he said he had been doing it to you to[o]." D.R. acknowledged that "[h]e did it to me too."

After seeing the text messages, Sutherland confronted D.R., and D.R. started crying and told her that Rosalez "tried to put it in, but I pushed him away because it hurt." When Sutherland asked why D.R. never said anything before, "she said because she knew if I knew that I would never let her see her father again." Sutherland reported this to police in Austin, and she later provided the text messages to police in Portland. She took D.R. to a forensic interview and sexual assault examination.

Karyzza Cavazos testified she conducted the forensic interview of D.R. on June 24, 2019, at the Center for Child Protection in Austin. A video recording of the hour-long interview was entered into evidence and played for the jury. In the interview, D.R. reported that the abuse first occurred when she was around eight years old and living in an apartment in Corpus Christi. D.R. said that, on that occasion, Rosalez "tried to put" his penis in her mouth and in her vagina. Another time, when she was around twelve or thirteen, she woke up with her clothes off and Rosalez was "trying to put" his penis in her vagina.

6

D.R. testified that she was in tenth grade at the time of trial. She said her father abused her between the ages of eight and around thirteen. She said Rosalez put his penis in her mouth and tried to put his penis in her vagina. She said that when she told Rosalez that it hurt, Rosalez would stop, but he "would try again" a few minutes later. According to D.R., Rosalez told her "he was preparing me for the future . . . [f]or when I had like a boyfriend and it wouldn't hurt as much when we had sex." She said she visited Rosalez every other weekend, and he would abuse her during some of those weekends. D.R. also testified that Rosalez would take naked photos of her. She said she did what Rosalez told her to do because he was her father, and she did not tell anyone about it because she was scared she would not be able to see him again. On cross-examination, defense counsel asked D.R. why she continued to visit Rosalez even after the abuse started; D.R. replied, "Because he's my father."

Jennifer Schroeder testified she performed A.H.'s sexual assault examination on June 13, 2019. According to medical records, A.H. provided the following history:

> [Rosalez], my step-dad had done something bad to me. When I was in 3rd grade, we had gone out for the day when we dropped off my mom at work. [Rosalez] said I had to go take a shower before I went to my Grandma's house. So I went to take a shower. Then he said he needed to get something from the bathroom. So I jumped out of the shower unlocked the door then real quick jumped back in the shower. He said my mom wanted him to check me. Then he asked if I trusted him. I said yes. Then he asked me again if I trusted him. I said yes again. Then he opened the shower curtain. He sat down on the toilet and told me to close my eyes. He touched me (patient indicates female breast by pointing). Then he told me to sit down on top of him. I felt something go in between my legs. His penis went into my vagina. Then he started to move me and he started to move. This happened for about 10 minutes. Then I got up and finished taking my shower. Then some[]times he would come in my room and put his finger or penis in my vagina. Some nights when he would come in my room I would pretend like I was sleeping and roll over. Those times he would just walk out of my room. This happened one or two times a week except when I was on my period. There was only one time he put his penis in my vagina when

7

I was on my period. When he would do these things to me he would take 7 to 10 pictures of me on an IPad. Most of the times he tells me to close my eye[s] but there was one time in the 4th grade he told me to open my eyes during it. When I was in the 5th grade, my mom went to a wedding. I got a text from my mom saying that she needed [Rosalez] to check me again. I started crying and I texted back no I didn't want to do that again. Then I figured out my mom did not have her phone with her. Then [Rosalez] came in my room [and] he told me to delete the messages and he was doing this to get back at my mom cause he thought my mom was cheating on him. I thought he was going to stop but he didn't. The last time he did something was in the beginning of this March. He came in my room, started touching me (patient indicates female breast by pointing). Then he took off my clothes and put his penis in my vagina. After he was done he put my clothes back on. Then an hour later he came back and did it again.

No physical evidence of trauma was observed in the physical examination. Schroeder agreed that, "when there is a delayed outcry," there is not usually any type of physical evidence of abuse found.

At trial, A.H. gave testimony matching the medical history she gave to Schroeder. She said the abuse occurred "about two or three times a week" for more than a month, until she was eleven years old. She said: "I thought this was like something that happened with like every kid and you just weren't supposed to tell our parents about it or something." Later, she became suspicious and tried to avoid Rosalez. She tried locking her door to her room, but "[h]e would open the door with the credit card." She confirmed that the text message exchange entered into evidence was between her and D.R.

On cross-examination, A.H. stated she did not scream when Rosalez broke into her room because she was afraid that Rosalez would "do something to" her mother. She explained that, when she was younger, Rosalez "would hit [Hernandez] or push her around the house."

Sonja Eddleman, director of the child abuse resource and evaluation team at Driscoll Children's Hospital, testified that she evaluated D.R.'s sexual assault examination

report. She agreed that D.R. provided a verbal history of abuse, but there was no physical evidence that penetration occurred, and no DNA evidence was recovered. Eddleman testified at length regarding the SANE examination process, female genital anatomy, and what constitutes penetration. She agreed that it is "very rare" in "these types of cases" to find medical evidence of penetration such as physical trauma or DNA.

Rosalez testified in his own defense. He said he graduated from high school in 2005. After his mother passed away in 2018, he suffered from depression. He takes medication for depression and anxiety. He testified that he cleaned, cooked, and generally took care of the household while Hernandez worked. He denied that he was ever physically violent with Hernandez. He explained that Hernandez asked him to leave the residence in January of 2019 due to "trust issues." In particular, he said he "went through her phone" and "saw that she was messaging some other guy," so he confronted her; Hernandez then became upset and said Rosalez "was, you know, psycho for going through her phone." Rosalez denied ever taking a photo of A.H. or D.R. when they were naked or partially clothed, and he denied ever owning an iPad.

Rosalez stated that he received a phone call from Hernandez several months later in which she said she was reporting him to the police. Rosalez went to the police station and "told them that I heard she made a report about me and if it was true then I was there to turn myself in." He gave a statement to police in which he denied all of the allegations against him. He again denied all of the sexual abuse allegations at trial. He did not know why A.H. and D.R. would make the allegations. He said that he and Sutherland "hardly spoke" and were not arguing.

The jury found Rosalez guilty on all three charges. At the sentencing stage, the court admitted all of the testimony previously offered at the guilt/innocence stage. Eddleman then provided additional testimony regarding sex offenders and their victims. She stated that there is "absolutely" a "high rate of recidivism" regarding pedophiles and sex offenders, and that it is "very common" for such individuals to "molest relatives of theirs," including children. Eddleman stated: "I hear on TV about teaching your children about stranger danger and they may do something to you, but we see about 2,800 children a year at Driscoll Children's Hospital for concerns of abuse and 90 to 94 percent are family members that have abused them."

Rosalez's father and younger half-brother testified on his behalf. They said they had never seen Rosalez act inappropriately around children and asked for him to serve the minimum sentence. In closing, the State argued that "[t]his case cries out for a maximum penalty" and asked the trial court to impose life sentences.

The trial court sentenced Rosalez to imprisonment for sixty years, forty years, and forty years, respectively, for the three offenses, and ordered the sentences to be served consecutively. This appeal followed.[5]

## II.    DISCUSSION

### A.    Appointment of Expert Witness

By his first issue, Rosalez argues the trial court erred by denying his counsel's pre-trial request for the appointment of, and funds for, an expert witness on the subject of child forensic interviews. Rosalez cites rules and cases concerning the *admissibility* of expert testimony regarding complainant credibility in child sexual abuse cases. *See* TEX.

---

[5] The State has not filed an appellee's brief in either cause number.

R. EVID. 702; *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Schutz v. State*, 957 S.W.2d 52, 73 (Tex. Crim. App. 1997) (holding that a "direct comment on the truthfulness of the complainant's allegations" is inadmissible); *Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993). However, he does not cite any authority concerning the trial court's *appointment* of an expert or the allocation of funds to an indigent defendant for such an expert. He merely argues that his substantial rights were affected by the trial court's ruling. The issue is therefore waived as inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

Even if the issue were adequately briefed, it would lack merit. Due process entitles an indigent defendant to the appointment of an expert to assist in their defense when the defendant makes a preliminary showing that the issue for which they seek expert assistance is "likely to be a significant factor at trial." *Ake v. Oklahoma*, 470 U.S. 68, 74 (1985); *Williams v. State*, 958 S.W. 2d 186, 192 (Tex. Crim. App. 1997). To make the required threshold showing, the defendant's claim must be based upon more than undeveloped assertions that the requested assistance would be beneficial. *Williams*, 958 S.W. 2d at 192. Generally, the defendant's motion must make the defensive theory clear to the trial court and be supported by factual allegations or evidence that expert testimony would support the theory. *Id.*; *see Rey v. State*, 897 S.W.2d 333, 341 (Tex. Crim. App. 1995); *Ivie v. State*, 407 S.W.3d 305, 311–12 (Tex. App.—Eastland 2013, pet. ref'd). The authorization of additional funds for an indigent defendant is within the sound discretion of the trial court, and an abuse of discretion will not be found absent a showing of some specific need for the particular expert or how the defendant will be harmed if the funds are not approved. *Castillo v. State*, 739 S.W.2d 280, 294 (Tex. Crim. App. 1987).

Although the credibility of the child complainants was certainly a "significant factor at trial," there was no evidence that the children were coached or coerced, and Rosalez did not show that the appointment of an expert in child forensic interviews would have supported his defense. He argues on appeal that "an expert on acrimonious breakups and child support issues could shed light on the allegations propounded by the mothers and victims, as well as the delayed outcry and explanations offered by the victims." But to be entitled to funds for an expert witness, an indigent defendant must establish more than a mere possibility that the testimony would benefit his defense. *See Rey*, 897 S.W.2d at 341; *Ivie*, 407 S.W.3d at 311–12. Here, the trial court did not abuse its discretion by denying Rosalez's request for the appointment of an expert witness to assist his defense. We overrule Rosalez's first issue.

## B. Order to Cumulate Sentences

By his second issue, Rosalez argues the trial court erred by ordering his sentences to run consecutively. Generally, the decision of whether multiple sentences will run consecutively or concurrently is left to the trial court's "absolute discretion." *Byrd v. State*, 499 S.W.3d 443, 446 (Tex. Crim. App. 2016); *see* TEX. CODE CRIM. PROC. ANN. art. 42.08(a); *LaPorte v. State*, 840 S.W.2d 412, 415 (Tex. Crim. App. 1992). However, a court abuses its discretion if it imposes consecutive sentences where the law requires concurrent sentences. *Byrd*, 499 S.W.3d at 447. Section 3.03(a) of the Texas Penal Code generally requires sentences to run concurrently "[w]hen the accused is found guilty of more than one offense arising out of the same criminal episode prosecuted in a single

criminal action." TEX. PENAL CODE ANN. § 3.03(a).[6] But § 3.03(a) contains an exception for when each conviction is for a specified sex offense (including continuous sexual abuse of a young child and aggravated sexual assault) that is "committed against a victim younger than 17 years of age at the time of the commission of the offense." *See id.* § 3.03(b)(2)(A). Under the statute, even if those offenses arose out of a single criminal episode and were prosecuted in a single criminal action, the court nevertheless retains discretion to stack the sentences. *See id.* It is undisputed that the child victims in this case were under seventeen years of age at the time of the offenses.

Rosalez appears to argue that cumulation of sentences was impermissible because the "the two offenses were prosecuted under two distinct statutes in two distinct indictments" and "[t]he State chose to prosecute both offenses together in one jury trial." He cites no authority, and we find none, establishing that a trial court abuses its discretion in that situation. We conclude the trial court did not abuse its discretion by ordering the sentences to run consecutively. *See Byrd*, 499 S.W.3d at 446. Rosalez's second issue is overruled.

C.     **Ineffective Assistance of Counsel**

By his third issue, Rosalez contends his trial counsel provided ineffective assistance by failing to object to a single trial on both indictments.

---

[6] "Criminal episode" means:

the commission of two or more offenses, regardless of whether the harm is directed toward or inflicted upon more than one person or item of property, under the following circumstances:

(1)     the offenses are committed pursuant to the same transaction or pursuant to two or more transactions that are connected or constitute a common scheme or plan;  or

(2)     the offenses are the repeated commission of the same or similar offenses.

TEX. PENAL CODE ANN. § 3.01. Rosalez does not argue in his brief that the three offenses arose out the same criminal episode. For purposes of this opinion, we assume but do not decide that they did.

To obtain a reversal of a conviction on grounds of ineffective assistance of counsel, a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694).

Section 3.02 of the penal code provides that "[a] defendant may be prosecuted in a single criminal action for all offenses arising out of the same criminal episode." TEX. PENAL CODE ANN. § 3.02(a). When multiple offenses are consolidated or joined under § 3.02, the defendant shall generally "have a right to a severance of the offenses." *Id.* § 3.04(a). But this right to severance "does not apply" to a prosecution for continuous sexual abuse of a young child or aggravated sexual assault "unless the court determines that the defendant or the state would be unfairly prejudiced by a joinder of offenses, in which event the judge may order the offenses to be tried separately or may order other relief as justice requires." *Id.* § 3.04(c). Moreover, even if the alleged offenses did not arise out of a single criminal episode, multiple pending indictments against a single defendant "may be consolidated in a single trial with the consent or absent an objection by and with the implied consent of the defendant." *Garza v. State*, 687 S.W.2d 325, 330

14

(Tex. Crim. App. 1985) (citing *Watson v. State*, 488 S.W.2d 816 (Tex. Crim. App. 1972); *Jones v. State*, 480 S.W.2d 623 (Tex. Crim. App. 1972); *Royal v. State*, 391 S.W.2d 410 (Tex. Crim. App. 1965)).

Here, trial counsel implicitly consented to the consolidated trial by failing to object. *See id.* Rosalez argues that "the jury's knowledge there were two victims greatly impacted the verdict, especially in light of the nature of the evidence, which involved only the statements of each victim—to the mothers, to the forensic interviewer, to the SANE nurse and in text messages to each[]other." He therefore contends that, had his trial counsel requested severance, that request would have been granted, and it would have "arguably" led to a "different outcome."

We disagree. There is nothing in the record indicating that Rosalez or the State were "unfairly prejudiced" by a consolidated trial on both indictments. *See* TEX. PENAL CODE ANN. § 3.04(c). In particular, although Rosalez complains about "the jury's knowledge there were two victims," evidence concerning the abuse of A.H. would have likely been admissible in a separate trial on the charges concerning D.R., and evidence concerning the abuse of D.R. would have likely been admissible in a separate trial on the charges concerning A.H. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2(b) (providing generally that "evidence that the defendant has committed a separate [sexual or assaultive offense against a child] may be admitted in the trial of an alleged [sexual or assaultive offense against a child] for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant"). In other words, even if separate trials were held, it is likely the juries in both trials would have been made aware that there were two victims.

15

Therefore, Rosalez cannot show that he was unfairly prejudiced by the consolidated trial. *See* TEX. PENAL CODE ANN. § 3.04(c). It follows that trial counsel was not ineffective for failing to move for severance. *See Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998) (holding that to prevail on a claim of ineffective assistance for failure to file a motion, appellant was obliged to prove that the motion would have been granted). We overrule Rosalez's third issue.

**D.    Cruel and Unusual Punishment**

Finally, Rosalez argues by his fourth issue that his sentences are "grossly disproportionate" to the offenses and constitute cruel and unusual punishment.

The Eighth Amendment to the United States Constitution, applicable to state courts through the Fourteenth Amendment, prohibits punishments that are "grossly disproportionate to the severity of the crime" and those that do not serve any "penological purpose." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1144 (2019) (Breyer, J., dissenting) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 & n.7 (1976)); *see* U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."); *id.* amend. XIV. But as long as a sentence is legal and assessed within the legislatively determined range, it will generally not be considered excessive, cruel, or unusual. *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016); *see Ewing v. California*, 538 U.S. 11, 21 (2003) (noting that, "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare"); *Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006) (orig. proceeding) (noting that "the sentencer's discretion to impose any punishment within the prescribed range is essentially unfettered").

Rosalez concedes that the sentences imposed are within the applicable punishment range for the charged offenses, each of which are first-degree felonies. *See* TEX. PENAL CODE ANN. § 12.32(a) (stating that the punishment range for a first-degree felony is five to ninety-nine years' or life imprisonment); *id.* § 21.02(h) (stating that the minimum sentence for continuous sexual abuse of a young child is twenty-five years' imprisonment). He nevertheless argues that "a stacked sentence of 140 years is far beyond the statutory limit for either offense and does not fall within the applicable punishment range." But we have already held that the trial court did not err by ordering the sentences to be served consecutively.

In any event, Rosalez has not preserved this issue for review on appeal. He made no objection to his sentence either at the time of sentencing or in any post-trial motion. To preserve a complaint of cruel and unusual punishment for appellate review, an appellant must make a timely objection to the trial court, state the specific grounds for the objection, and obtain a ruling. *See* TEX. R. APP. P. 33.1(a); *Smith v. State*, 721 S.W.2d 844, 855 (Tex. Crim. App. 1986); *Trevino v. State*, 174 S.W.3d 925, 927–28 (Tex. App.—Corpus Christi–Edinburg 2005, pet. ref'd) (noting that "[e]ven constitutional claims can be waived by failure to object"). By failing to specifically object during trial or in a post-trial motion, Rosalez has waived any error for our review. *See* TEX. R. APP. P. 33.1(a); *Trevino*, 174 S.W.3d at 927–28 ("Because the sentence imposed is within the punishment range and is not illegal, we conclude that the rights [appellant] asserts for the first time on appeal are not so fundamental as to have relieved him of the necessity of a timely, specific trial objection."). We overrule his fourth issue.

17

### III. CONCLUSION

The trial court's judgments are affirmed.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
25th day of August, 2022.