# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00224-CR

---

**Kevin Simpson, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
NO. 19-0379-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Kevin Simpson was convicted by the trial court of injury to an elderly individual and sentenced to four years' confinement. *See* Tex. Penal Code § 22.04(a), (f). In six issues, appellant contends that the trial court abused its discretion by improperly admitting extraneous-offense evidence, that the evidence is legally insufficient to support his conviction, and that the evidence is legally and factually insufficient to support the trial court's implied rejection of his affirmative defense of insanity. We will affirm the trial court's judgment of conviction.

### BACKGROUND

Following an altercation at his mother Carol's house on February 19, 2019, appellant was arrested and charged with injury to an elderly individual with intent to cause bodily injury. The indictment alleged that appellant had intentionally and knowingly caused

bodily injury to Carol by "grabbing and squeezing" her and by pushing her with his hand or hands. Carol and Officer Patrick Nelson, a former deputy with the Williamson County Sheriff's Office, were called as witnesses by the State at trial.

Carol testified that she was sixty-six years old in February 2019 and that her sons, appellant and Eric, lived with her at her home in Georgetown, Texas. She testified that there had been "a lot of agitation" on February 18th and 19th resulting in part from appellant's mental state because "[t]here were always questions about things being done." Specifically, she and Eric "had a problem" with appellant on the 18th because appellant, who was "reclusive," was keeping his dog confined in his room and not allowing it to go outside. When she took a cell-phone video of her trying to let appellant's dog out, it started an argument between her, appellant, and Eric. She also testified that later in the day, appellant began complaining about his mouth or tooth hurting.

She testified that she bought appellant Orajel the next day but that he did not want it and told her that it would not help him. She also testified that "at one point"—she did not know "if it was because of the way he was feeling or what"—he became "real[ly] agitated, came out of his room with a bat, and hit a bedroom door with it, creating a hole"; she added "that now makes all three bedroom doors with holes in them." Although she testified that she could not recall "what opened it up or started the further verbal stuff," appellant was irritated with her that evening and "started hollering or fussing at [her]." She did not remember why he was upset but explained that "it's always just gibberish. That's just it. He comes in telling [me] that we're wanting to hurt him or we murdered him, and I'm like, [']Well, you're not murdered because you're here alive with me, so I don't know what you're talking about.['] It's just all nonsense, you know." Appellant's voice was "usually raised" when they "talked like this."

2

She testified in detail about the altercation that occurred that evening while she and appellant were in the kitchen and Eric was in the living room. During the argument, appellant "came toward [her]," and she began taking another video on her phone. Appellant tried to grab the phone out of her hand and "squeezed [her] hand real hard," which "hurt for a moment" because she has arthritis. She "managed to get it away from him," but he then "grabbed her and kind of pushed [her] away." She did not remember there being any visual injury to her hand, recalled that "other than [her] hand" it was not painful, and observed that she and appellant backed away from each other after she pulled her hand away. She could not remember what appellant said during the altercation, but it "was getting a bit loud," and Eric called 911 because he was concerned that the situation was going to escalate. Once she learned that the police had been called, she locked herself in her room "[s]o that [appellant] didn't come try to talk to [her] or do anything again."

Moreover, she testified that appellant had been violent toward her twice before. In 2014, he came into her bedroom and put her in a choke hold. She could not remember "any of the before and after," but it felt "[h]orrible" and "very frightening," and Eric had to pull appellant off of her. In 2017, appellant pushed her into a kitchen counter hard enough to knock the wind out of her.

She also testified that there had been "ongoing issues" with appellant's mental health. In one incident, he had been taken by EMS to the hospital "instead of [being] immediately arrested," and a doctor had "noticed some issues and thought that he was bipolar schizophrenic." Appellant took Olanzapine for a short period of time but thereafter stopped taking the medication or attending meetings.

3

On cross-examination, she testified that she and appellant have "sort of a strained relationship." She testified that her concern about appellant's treatment of his dog was "one of the many things" giving rise to the altercation, but "the main thing" was appellant's "irrational thinking" and "continual . . . nonsense." She elaborated:

> I was tired of having to be concerned about, do I need to worry about him hurting me, because I never thought he would hurt me really, but then a choke hold one year and then he pushed me that time, but I never thought he would really hurt me. But I basically got to the point where I stayed in my room and I left him alone if I didn't have to be in the other part of the house, and I didn't bother him if I didn't have to.

She also testified that she has not given her cellphone videos to anyone because "no one has ever asked" and that other than her testimony, she is "not aware of anything showing proof" that the injury occurred.

Officer Nelson testified that he was dispatched to a disturbance-in-progress call and spoke with Carol, Eric, and appellant at Carol's home. He testified that appellant initially complained about pain in his teeth and mouth, but that after Nelson requested that EMS evaluate appellant, he refused treatment. Nelson testified that appellant told him that Carol was somehow causing the tooth pain but that he "did not describe any type of physical violence that would have resulted in such an injury to cause that type of pain." Nelson also testified that he found appellant's statements to be "[u]nusual and not credible," that appellant's demeanor was in an "elevated state," and that, based on appellant's statements, he formed the opinion that appellant could be "in some sort of mental health episode."

Nelson testified that he did not take any photos or collect any videos from anyone on the night of the incident. On cross-examination, he testified that he believed a detective would follow up and "potentially get that evidence." He also testified that he thought another

4

officer who had been present was recording the scene with a body camera. Lastly, he testified that he did not see any visible injuries on Carol and that "basically [he was] just going off what she told [him] and off what [appellant] told him."

The trial court found appellant guilty and, following a hearing on punishment, sentenced him to four years' confinement. This appeal followed.

## DISCUSSION

**Extraneous-Offense Evidence**

In his first three issues, appellant contends that the trial court abused its discretion by allowing Carol to testify about the 2014 and 2017 extraneous offenses. Specifically, he asserts that the testimony had no relevance apart from proving character conformity and was inadmissible under Texas Rules of Evidence 403 and 404(b), as well as Article 38.371 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 38.371 (allowing for admission of extraneous-offense evidence for limited purposes—including contextualizing nature of relationship between defendant and alleged victim—in prosecution for offense committed against member of defendant's family); Tex. R. Evid. 403 (permitting trial court to exclude evidence if its probative value is substantially outweighed by danger of unfair prejudice or confusing issues), 404(b) (prohibiting admission of extraneous-offense evidence to show that defendant acted in accordance with his character).

To preserve error for appellate review, the record must show that: "1) the complaining party made a timely and specific request, objection, or motion; and 2) the trial judge either ruled on the request, objection, or motion (expressly or implicitly), or he refused to rule and the complaining party objected to that refusal." *Geuder v. State*, 115 S.W.3d 11, 13 (Tex.

5

Crim. App. 2003); *see also* Tex. R. App. P. 33.1(a); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004). An adverse ruling must be "conclusory; that is, it must be clear from the record the trial judge in fact overruled the defendant's objection or otherwise error is waived." *Ramirez v. State*, 815 S.W.2d 636, 643 (Tex. Crim. App. 1991). However, the ruling "need not be expressly stated" if the trial court's "actions or other statements otherwise unquestionably indicate a ruling." *Rey v. State*, 897 S.W.2d 333, 336 (Tex. Crim. App. 1995). A reviewing court will generally find that a trial court made an implicit ruling when "the objection was brought to the trial court's attention and the trial court's subsequent action clearly addressed the complaint." *State v. Kelley*, 20 S.W.3d 147, 154 n.3 (Tex. App.—Texarkana 2000, no pet.); *see also Miller v. State*, 83 S.W.3d 308, 319 (Tex. App.—Austin 2002, pet. ref'd) (finding trial court's ruling may be implied when court's actions or statements "unquestionably indicate a ruling"). In many cases, a trial judge will take an affirmative action to indicate an implicit ruling. *See Miller*, 83 S.W.3d at 319; *see also Chappell v. State*, 850 S.W.2d 508, 510 (Tex. Crim. App. 1993) (overruling defendant's objection to jury shuffle when trial judge granted State's motion to shuffle); *Ramirez*, 815 S.W.2d at 650 (finding trial judge "implicitly overruled" defendant's objection to State's question by directing witness to answer question); *Beebe v. State*, 811 S.W.2d 604, 605 (Tex. Crim. App. 1991) (concluding error was preserved where defendant requested additional time and trial judge stated he would attempt to dispose of all pending cases if "humanly possible" in the morning); *Cantu v. State*, 994 S.W.2d 721, 730–31 (Tex. App.–Austin 1999, pet. dism'd) (involving trial court implicitly overruling defendant's objection that witness was not qualified to answer question by instructing witness that he could answer if he knew); *Leal v. State*, 469 S.W.3d 647, 650 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (finding that trial court implicitly overruled defendant's motion to suppress by

6

admitting blood-analysis report and allowing analyst to testify to defendant's blood alcohol content).

Texas law also requires that an objection be made each time inadmissible evidence is offered unless the complaining party (1) obtains a running objection or (2) obtains an adverse ruling on its complaint in a hearing outside the presence of the jury. *See Lopez v. State*, 253 S.W.3d 680, 684 (Tex. Crim. App. 2008); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."). The second exception is codified in Texas Rule of Evidence 103(b), which provides that "[w]hen the court hears a party's objections outside the presence of the jury and rules that evidence is admissible, a party need not renew an objection to preserve a claim of error for appeal." Tex. R. Evid. 103(b).

Appellant's trial counsel requested a bench conference after the State attempted to question Carol about the 2014 and 2017 extraneous offenses. During the conference, the trial judge initially appeared to be confused about the nature of appellant's objection. Counsel first stated that he had "no problem with [Carol] discussing about what the nature of her relationship was in the past [pursuant to Article 38.371], but what [he did] have a problem with is, if we're going to start putting on extraneous evidence of prior convictions," which, he asserted, would violate Texas Rules of Evidence 404(b) and 609. *See* Tex. R. Evid. 404(b), 609 (requiring admission of evidence of criminal conviction for impeachment purposes under certain conditions). However, when the trial judge agreed that the State could "go into the compliance with 38.371 testimony that goes to the nature of the relationship" and that the dispositions of appellant's prior cases would be irrelevant, counsel clarified, "Well, that's my only fear . . . . I

7

just don't – want to make sure that we're not saying, Hey, he's done this in the past; once an abuser, always an abuser. That's character evidence – that's character conformity evidence." The trial judge responded that she would first have to hear the evidence and would "have to be trusted" to "make those distinctions and determinations as – ultimately to the ultimate issue of guilt-innocence in this case."

When counsel asked whether his objection was sustained or overruled, the trial judge replied, "It's sustained, but . . . I don't think [the State is] attempting to go there yet. So I don't think there's . . . an objection to be lodged." The judge then asked whether appellant was "objecting to [the State] going into any of those incidents," to which counsel explained "I just don't . . . want to get into 609 evidence." The judge reassured counsel that the State was not going to inquire about convictions.

Despite the apparent resolution of the objection, however, the following exchange then occurred:

> DEFENSE COUNSEL: I just want to make sure we're clear for the record. 404(b), this kind of seems like extraneous offenses, you know, like, you know, once an abuser, always an abuser kind of – he's done it before; he'll – he's probably done it this time in this instant case. I'm worried about that. If there's some sort of – you know, once I raise that objection, you know, the burden kind of shifts to the State for them to say what the anticipated use of it is under 404(b), and then if I, you know – and if the Court sustains it, then I have a 403 objection.
>
> THE COURT: So until I've heard it, I can't determine whether or not it's relevant –
>
> DEFENSE COUNSEL: I know. That's why it's tricky, I know. That's why it's tricky. So if there's a reason that we need to –
>
> THE COURT: So we're going to hold off on the objection. I misunderstood you. I thought we were just coming to a meeting of the minds of what the testimony was going to be. I have to hear it. Then you can raise the objection if you believe it's going into 404(b).

8

DEFENSE COUNSEL: Yeah. I mean, I think this Court is – I'll just put it this way. I think the Court is cognizant of the fact that – against the prohibition against, you know, character conformity evidence and will –

THE COURT: Absolutely.

DEFENSE COUNSEL: – and will decide accordingly. I just want to make sure that we're clear on the record because I just don't want there to be a lot of talk about extraneous offenses and all these things he's done, you know. And she can talk about the nature of their relationship, and that's okay and I have no problem with that.

THE COURT: It's very clear to me that I will be determining [appellant]'s guilt-innocence based on the testimony that I'm hearing about the incident that is alleged to have occurred in this cause – . . . not anything else.

DEFENSE COUNSEL: So you want to just put off a ruling on my objection . . . until such time as the testimony is elicited?

THE COURT: Yes, sir. Yes, sir.

Carol subsequently testified about the 2014 and 2017 incidents. Appellant made no further objections nor was the admissibility of the testimony further addressed.

First, although it appears that there may have been a misunderstanding between the trial judge and counsel regarding the nature of counsel's objection, we "should not hesitate to hold that appellate complaints arising from the event have been lost" when "it seems from context that a party failed effectively to communicate his desire." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992); *see Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("[W]e consider the context in which the complaint was made and the parties' shared understanding at that time."). To preserve an issue for appeal, the complaining party must let the judge know what he wants "clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena*, 285 S.W.3d at 464.

Consequently, insomuch as the trial court failed to apprehend appellant's objection, it was not preserved for appellate review.

Second, we disagree with appellant's assertion that the trial court's "subsequent actions" of "listening to the testimony of the extraneous offenses," finding appellant guilty, and "granting a certificate of appeal" amounted to a "crystal clear" implicit overruling of appellant's objection. What is clear, rather, is that the trial court considered counsel's objection to Carol's anticipated extraneous-offense testimony premature at the time of the bench conference and that the trial judge advised counsel that he could object to specific testimony after it was made. *See* Tex. R. App. P. 33.1(a) (requiring that an objection be "timely"). To the extent that the trial court made an adverse ruling against appellant during the conference, it was not "conclusory," *see Ramirez*, 815 S.W.2d at 643, and the court's failure to rule *sua sponte* on the admissibility of Carol's testimony as it was elicited—particularly in light of the trial judge's instruction to counsel—did not "unquestionably indicate a ruling." *Rey*, 897 S.W.2d at 336; *see Miller* 83 S.W.3d at 319.

While appellant cites the Texas Supreme Court's decision in *In re Z.L.T.*, 124 S.W.3d 163, 164 (Tex. 2003)—a civil opinion that is not binding on us, *see In re Meza*, 611 S.W.3d 383, 393 (Tex. Crim. App. 2020)—for the proposition that "[t]he trial court[']s action of proceeding without granting the requested relief makes it clear that the trial court implicitly denied the request," he overstates the scope of that holding. The Court held only that the trial court did not abuse its discretion by implicitly denying an incarcerated father's request for a bench warrant to attend a trial on a suit to establish the parent-child relationship between him and his three minor children. *See id.* at 166. In its initial preservation analysis, the Court noted that "[b]y proceeding to trial without issuing the bench warrant, it is clear that the trial

court implicitly denied [the father's] request." *Id.* at 165. Not only was the Court's determination made with respect to a distinct set of facts in a wholly different legal context, however, but it also involved precisely the sort of affirmative action on the part of the court—namely, setting the case for trial—that is missing here. Thus, because the record does not show that the trial judge ruled on appellant's objection, implicitly or explicitly, or that appellant objected to any refusal to rule on the part of the judge, appellant failed to preserve error concerning his evidentiary issues. *See Geuder*, 115 S.W.3d at 13.

Moreover, even if the trial judge implicitly overruled appellant's objection by listening to Carol's extraneous-offense testimony, finding appellant guilty, and entering a certificate of appeal, appellant failed to preserve error by not renewing his objection at the time the testimony was made. *Lopez*, 253 S.W.3d at 684. Appellant contends that raising the objection during a bench conference was sufficient under Rule of Evidence 103(b) to preserve error without needing to renew the objection. However, the Rule expressly provides that an objecting party need not renew an objection when the court hears the objection "outside the presence of the jury *and rules that evidence is admissible*." Tex. R. Evid. 103(b) (emphasis added). In other words, the exception applies only when the trial court rules at the bench conference that the objected-to evidence be admitted. *See id.* Thus, even were appellant correct in asserting that the trial judge's actions during and after Carol's testimony implicitly overruled appellant's bench-conference objection, the admissibility ruling was not made at the proper time for the exception to apply. We therefore overrule appellant's first three issues.

11

*Sufficiency of the Evidence*

### 1.    Intent

In his fourth issue, appellant contends that the evidence was legally insufficient to prove that he acted with the requisite *mens rea*. Specifically, appellant argues that there is no evidence in the record that he squeezed Carol's hand with the intent to cause her pain.

Due process requires that the State prove beyond a reasonable doubt every element of the charged offense. *Jackson v. Virginia*, 443 U.S. 307, 313–14 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Braughton v. State*, 569 S.W.3d 592, 607–08 (Tex. Crim. App. 2018). While the factfinder is permitted to draw reasonable inferences from the evidence, it may not come to conclusions based on mere speculation or unsupported inferences. *See Witcher v. State*, 638 S.W.3d 707, 708 (Tex. Crim. App. 2022); *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021). We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 319; *see Braughton*, 569 S.W.3d at 608. Our "role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016). The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an

12

evidentiary-sufficiency review, we "may not reevaluate the weight and credibility of the evidence" and substitute our judgment for that of the factfinder. *Braughton*, 569 S.W.3d at 608; *Arroyo*, 559 S.W.3d at 487; *see Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (stating that reviewing court "must not usurp" jury's role by "substituting its own judgment for that of the jury"). Instead, we must defer to the factfinder's credibility and weight determinations. *Braughton*, 569 S.W.3d at 608; *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016). When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733. We "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

"It is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Indeed, proof of mental state "will almost always depend upon circumstantial evidence." *Duntsch v. State*, 568 S.W.3d 193, 216 (Tex. App.—Dallas 2018, pet. ref'd). The finder of fact may infer that a defendant intends the "natural consequences of his acts." *Owens v. State*, 549 S.W.3d 735, 741 (Tex. App.—Austin 2017, pet. ref'd). Intent or knowledge may also be inferred "from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the

13

nature of wounds inflicted on the victims." *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999); *see Owens*, 549 S.W.3d at 741.

As charged in this case, a person commits the offense of injury to an elderly individual if he or she intentionally or knowingly by act causes bodily injury to an elderly individual. *See* Tex. Penal Code § 22.04(a), (f). "'Bodily injury' means physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8). An offense under section 22.04(a) is a result-oriented crime; the gravamen of the offense is the intent to cause the result—bodily injury to an elderly individual. *Plants v. State*, 124 S.W.3d 414, 416 (Tex. App.—Fort Worth 2003, no pet.); *see also Kelly v. State*, 748 S.W.2d 236, 239 (Tex. Crim. App. 1988) (observing that culpable mental state must apply to serious bodily injury inflicted on elderly individual); *Banks v. State*, 819 S.W.2d 676, 680 (Tex. App.—San Antonio 1991, pet. ref'd) (stating that conviction for result-oriented offense cannot be based solely on finding that defendant intentionally or knowingly engaged in conduct which happened to cause bodily injury).

Carol testified that appellant had a history of domestic violence against her. In 2014, appellant came into her bedroom and put her in a choke hold until Eric intervened. In 2017, following an argument, appellant pushed her into a kitchen counter hard enough to knock the wind out of her. She testified that she was "tired of having to be concerned about, do I need to worry about him hurting me" and would stay in her room to avoid him.

She also testified about the events leading up to and on the day of the alleged offense. The day before, she and appellant had gotten into an argument after she attempted to record a cellphone video of her letting appellant's dog out. The next day, appellant became agitated and swung a bat into a bedroom door, which, she noted, "now makes all three bedroom doors with holes in them." That evening he became irritated with her and "started hollering and

14

fussing at [her]." While she testified that she could not remember why appellant was upset, she explained that:

> it's always just gibberish. That's just it. He comes in telling [us] that we're wanting to hurt him or we murdered him, and I'm like, ["]Well, you're not murdered because you're here alive with me, so I don't know what you're talking about.["] It's just all nonsense, you know.

When appellant "came toward [her]," she began recording another cell-phone video. At trial, she gave two similar accounts of what happened next, testifying first: "I had my phone in my hand, and [appellant] tried to grab the phone out of my hand and squeezed my hand real hard. And I got him to back off." Later, she testified that appellant:

> tried to take the phone away from me, and as he did, he grabbed it. And I was trying to hold on to it tightly, and he in turn also tightly grabbed it. And I managed to get it away from him, and he grabbed and kind of pushed me away.

She testified that when appellant grabbed her hand and squeezed, it "hurt for a moment" because she has arthritis. Similarly, asked how it felt when she was pushed, she replied, "You mean, was it painful? No, other than my hand." When asked what the volume of appellant's voice was, she answered that "his voice was usually raised when we talked like this." However, she testified that the altercation was loud enough that Eric, who was in another room, called 911 because he was "concerned that something was going to escalate."

Appellant contends that the evidence shows only that he intended, as a result of his mental illness, to defend himself and not to cause Carol bodily injury. Texas, however, does not recognize a diminished-capacity defense. *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005). To the extent that appellant argues that mental illness rendered him incapable of forming the necessary intent, the argument "is simply a failure-of-proof defense in which the

15

defendant claims that the State failed to prove that the defendant had the required state of mind at the time of the offense." *Id.*

Two cases from the Court of Criminal Appeals illustrate the distinction. In *Jackson*, the defendant killed his brother following an argument. *Id.* at 569. At trial, evidence was presented that the defendant suffered from schizophrenia and bipolar disorder and thought that his brother "was out to get him." *Id.* at 570–72. The Court concluded that the evidence of mental illness "does not negate mens rea" but, to the contrary, "makes it even more apparent that [the defendant] intended to cause bodily harm or death to his brother." *Id.* at 572. As the Court explained, "The evidence of appellant's paranoia simply provides a motive for the intentional act. The evidence presented was the type of excuse-based evidence that would be raised as an affirmative defense," and "Texas law does not recognize a lesser form of the insanity affirmative defense." *Id.*; *see Mays v. State*, 318 S.W.3d 368, 380–81 (Tex. Crim. App. 2010) (concluding defendant's delusional thinking, paranoia, and distrust of police officers "demonstrated his motive for killing [them]" but did not "rebut the culpable mental state of 'intentional or knowing' conduct or raise any legal justification or exoneration for the murders").

The Court reaffirmed its *Jackson* holding in *Ruffin v. State*, in which it held that both lay and expert testimony regarding a mental illness that directly rebuts the necessary *mens rea* is relevant and admissible unless excludable under a specific evidentiary rule. *See* 270 S.W.3d 586, 597 (Tex. Crim. App. 2008). In *Ruffin*, the defendant—convicted of first-degree aggravated assault—had engaged in a shootout with police officers, testifying at trial that he believed them to be "Muslims" who were hunting him. *Id.* at 590. The trial court excluded testimony from an expert who believed that the defendant had become psychotic; was suffering from delusions, paranoia, and irrationality; and had a "diminished capacity" to make

16

rational judgments. *Id.* The Court of Criminal Appeals concluded that the trial court's ruling was an abuse of discretion, explaining that evidence of "when and how paranoid delusions may distort a person's auditory and visual perceptions is admissible as it relates to whether appellant intended to shoot *at police officers*," whose status was an element of the offense. *Id.* at 597 (emphasis added). However, the Court "emphasized that the defendant was still guilty of aggravated assault because he intended to shoot at a person, but simply did not appreciate that the person he was shooting at was a police officer." *Iniquez v. State*, 374 S.W.3d 611, 619 (Tex. App.—Austin 2012, no pet.) (citing *Ruffin*, 270 S.W.3d at 594).

The evidence showed that appellant grabbed Carol's hand and squeezed it very hard, causing her pain. That he may have believed that Carol had murdered him or that she was responsible for his tooth pain does not rebut or negate his intent. Rather, it would merely provide a motive for his conduct. From this record—and resolving any conflicts in the testimony in favor of the verdict—we conclude that the evidence was legally sufficient for the trial court to find beyond a reasonable doubt that appellant intended to cause Carol bodily injury. We overrule appellant's fourth issue.

### 2. Insanity

In his fifth and sixth issues, respectively, appellant contends that the evidence was legally and factually insufficient to support the trial court's implied rejection of his affirmative defense of insanity. The State responds that the evidence presented to the trial court failed to raise the issue of insanity and that appellant possibly abandoned the defense.

Article 46C.152 of the Texas Code of Criminal Procedure provides that in a bench trial, the trial judge "shall determine the issue of sanity" if the issue is "supported by competent

17

evidence." Tex. Code Crim. Proc. art. 46C.152(a). The judge must do so "whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence." *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006) (citing *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999)); *see Kelly v. State*, 195 S.W.3d 753, 757 (Tex. App.—Waco 2006, pet. ref'd). When determining whether a defensive issue was raised, we view the evidence in the light most favorable to the defendant. *See Kuhn v. State*, 393 S.W.3d 519, 532 (Tex. App.—Austin 2013, pet. ref'd); *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); *Granger*, 3 S.W.3d at 38.

Section 8.01 of the Texas Penal Code provides that "[i]t is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code § 8.01. "Under Texas law, 'wrong' in this context means 'illegal.'" *Ruffin*, 270 S.W.3d at 592 (citing *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994)). The ultimate question is whether "the defendant factually know[s] that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified." *Id.* at 592. Thus, "[w]hile the defense is expressed in terms of a 'mental disease or defect,' the issue is not strictly a medical one. It is an issue that invokes ethical and legal considerations as well." *Graham v. State*, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978); *see Love v. State*, 909 S.W.2d 930, 943 (Tex. App.—El Paso 1995, pet. ref'd) ("Medically, an individual may be insane from a mental disease or defect yet, legally, he is not relieved of the criminal responsibility for that crime unless his mental condition reached the point where he was unable to distinguish right from wrong.").

The Court of Criminal Appeals considered what manner of testimony is sufficient to raise an insanity defense in *Pacheco v. State*. 757 S.W.2d 729, 736 (Tex. Crim. App. 1988); *see Kelly*, 195 S.W.3d at 756 (applying *Pacheco* standard). The Court declined to require expert testimony, holding that "predicated lay opinion testimony when considered with facts and circumstances concerning an accused and of the offense may be sufficient to raise the issue." *Pacheco*, 770 S.W.2d at 736 (emphasis added). However, the Court also reaffirmed two earlier decisions in which it determined that "the evidence of lay witnesses, who never undertook to express a conclusion or opinion on insanity," is insufficient. *Id.* at 735 (citing *Denison v. State*, 651 S.W.2d 754 (Tex. Crim. App. 1983); *Cato v. State*, 534 S.W.2d 135 (Tex. Crim. App. 1976)).

In the present case, neither Carol nor Officer Nelson testified that appellant was insane or prevented by a severe mental disease or defect from knowing that his conduct wrong at the time of the alleged offense. Even appellant asserts only that "every witness who testified at guilt-innocence testified as to facts . . . showing that . . . he did not know the difference between right and wrong when he squeezed his mother's hand." Because neither witness undertook to express a conclusion or opinion as to appellant's sanity, their testimony was insufficient under Pacheco to raise the issue of insanity before the trial court. *See Pacheco*, 757 S.W.2d at 735; *Kelly*, 195 S.W.3d at 757 (concluding that defendant was not entitled to insanity instruction because—although record contained evidence that he was not "himself" during commission of offense, that he was acting in significantly abnormal manner on that date, and that he experienced mental disease or defect afterward—there was no testimony in record, lay or expert, providing "definite opinion of insanity") (citing *Pacheco v. State*, 770 S.W.2d 834, 836 (Tex. App.—El Paso 1989, pet. ref'd)); *Nutter v. State*, 93 S.W.3d 130, 132 (Tex. App.—Houston

19

[14th Dist.] 2001, no pet.) (concluding that defendant's testimony was insufficient to raise insanity defense because he did not offer opinion as to his insanity at time of offense); *Henslee v. State*, No. 11-17-00163-CR, 2019 WL 3451490, at *3 (Tex. App.—Eastland July 31, 2019, pet. ref'd) (mem. op., not designated for publication) ("None of the witnesses expressed an opinion that, at any time, [defendant] did not know that his actions were wrong. Therefore, the trial court did not err by not submitting the requested insanity issue in the court's charge."); *Villarreal v. State*, No. 11-10-00211-CR, 2011 WL 2991549, at *2 (Tex. App.—Eastland July 21, 2011, pet. ref'd) (mem. op., not designated for publication) ("Evidence presented by a lay witness who never undertakes to express a conclusion or opinion on insanity is not sufficient to raise the issue."); *Horton v. State*, No. 12-20-00032-CR, 2021 WL 1916703, at *4 (Tex. App.—Tyler May 12, 2021, pet. ref'd) (mem. op., not designated for publication) (concluding that evidence was insufficient to raise insanity defense because "neither [defendant] nor any other witness offered an opinion as to his insanity"); *cf. Johnson v. State*, No. 11-07-00202-CR, 2008 WL 2842100, at *4 (Tex. App.—Eastland July 24, 2008, pet. ref'd) (mem. op., not designated for publication) (finding that victim's testimony that defendant "suffered from mental illness that she believed rendered him unable to know that his conduct was wrong" constituted competent evidence of his sanity).

Not only was the evidence insufficient to raise the issue of insanity before the trial court, but the record strongly supports the State's suggested inference that appellant in fact abandoned the defense before trial. Although appellant filed a timely notice of intent to raise the insanity defense, neither party broached the issue of appellant's sanity during questioning or argument. Indeed, the terms "insane" or "insanity" do not appear in the trial transcript, and the pretrial sanity evaluation ordered by the trial court was admitted into evidence for the first time

20

during the punishment phase. Similarly, neither witness was asked whether they believed that appellant knew that his conduct was wrong or illegal, and neither testified as to such knowledge. Appellant's trial strategy instead centered on challenging Carol's credibility and questioning whether the alleged assault actually occurred. As defense counsel explained during closing argument, "My client has pled not guilty, so, therefore, he believes it did not happen. We basically have a swearing match."

Because the defensive issue of insanity was not raised by competent evidence, the trial court was not required to determine the issue. *See* Tex. Code Crim. Proc. art. 46C.152(a). Moreover, we see no evidence in the record before us that the trial court considered, much less impliedly rejected, an insanity defense. As such, appellant's challenge to the sufficiency of the evidence supporting the rejection is without merit. We therefore overrule his fifth and sixth issues.

## CONCLUSION

Having overruled each of appellant's issues, we affirm the trial court's judgment of conviction.

_____

Rosa Lopez Theofanis, Justice

Before Justices Baker, Triana, and Theofanis

Affirmed

Filed:   March 24, 2023

Do Not Publish

21